STATE OF NORTH CAROLINA v. RICKY DALE LEDFORD

No. 452A84

(Filed 18 February 1986)

1. **Burglary and Unlawful Breakings § 5.2; Homicide § 21.6— first degree murder —felony murder—first degree burglary—time of offense—sufficiency of evidence**

There was no merit to defendant's contention that his conviction for first degree murder must be reversed because the State failed to prove beyond a reasonable doubt each and every element of the underlying felony, first degree burglary, particularly that the offense was committed during the nighttime, where the evidence tended to show that the last person to see the victim was her daughter; when the daughter left the victim's house at 3:00 p.m. on a Friday afternoon, the front window of the house was intact and the living room curtains were hanging straight; another of the victim's relatives saw the window on the following Saturday morning as she drove to work, and the window was broken; the curtain and broken glass were later found lying inside the room; a cab driver testified that, as he drove his taxi down the victim's street just before 2:00 a.m. on Saturday morning, he recognized defendant, whom he had known all of defendant's life, stepping onto the sidewalk in front of the victim's house; though it was dark, there were three streetlights in the vicinity; defendant did not acknowledge the cab driver's greeting but instead pushed something up under his shirt and kept walking; defendant's cousin testified that, while waiting for his paper route newspapers to be delivered around 2:00 a.m. on Saturday morning, he saw defendant walking toward a store from the direction of the victim's house; defendant displayed a roll of paper money, stating that he had been given the money in a gun deal; the victim's grandson found his grandmother bleeding and bruised in her bloodstained bed, wearing her pajamas, shortly after 9:00 a.m. on Saturday morning; and defendant offered several conflicting accounts as to his whereabouts on the night in question.

2. **Homicide § 21.4; Criminal Law § 61.2— first degree murder—identity of perpetrator—boot print—sufficiency of evidence**

The State's evidence with regard to defendant as the perpetrator of the crime was sufficient to be submitted to the jury where it tended to show that a boot print on the window side of a curtain in the victim's living room was made by the left boot which defendant was wearing on the night of the crime; cigarette butts taken from defendant's home and the cigarette butt taken from the nonsmoking victim's bedroom were the same brand; saliva on those cigarette butts was produced by a "type A secretor"; defendant was a type A secretor, as was 30% of the North Carolina population; a cab driver saw defendant step onto the sidewalk directly in front of the victim's home at 2:00 a.m. and stuff something into his shirt; the State introduced the checked flannel shirt which defendant admitted he was wearing on the night in question, and the cab driver stated that the shirt appeared to be the one defendant was wearing when the cab driver saw him; defendant's cousin testified that he saw

State v. Ledford

defendant at 2:00 a.m. on the day in question and defendant was displaying a roll of paper money at that time; the cousin saw defendant only minutes after the cab driver had seen him in front of the victim's house; and when defendant was arrested in the early hours two days later, he had in his possession over $400 consisting of bills similar in denomination to those which the victim had placed in a jar in her home two days before the assault.

3. Criminal Law § 61.2— boot print—admissibility of evidence

There was no merit to defendant's contention that shoe print evidence was inadmissible because it did not meet the three-part test for sufficiency of such circumstantial evidence set forth in *State v. Palmer*, 230 N.C. 205, since the boot print in question was discovered on the backside or window side of a curtain lying on the floor of the victim's living room "at or near the place of the crime"; the expert testified that the print could have been made only by defendant's left boot and by no other shoe; and there was evidence tending to connect defendant with the scene of the crime at or about the time the offenses were committed, including evidence that defendant was seen directly in front of the victim's home at 2:00 a.m. on the night in question and that defendant admitted he was wearing the boots corresponding to the print found on the curtain inside the victim's home.

4. Homicide § 15.5— expert opinion testimony—proximate cause of death—failure to use "could" or "might"

There was no merit to defendant's contention that, because a pathologist's testimony that injuries suffered by the victim on the date of the crime "were a proximate cause of her death" was not limited by the terms "could" or "might," it amounted to an expression of opinion as to an ultimate issue in the case and invaded the province of the jury, since the trial court accepted the witness as an expert in pathology; defendant did not object; the court properly concluded that the witness's testimony would assist the jury in understanding his testimony and in determining a fact in issue; defendant offered no evidence to the effect that the witness's expertise could not lead him to the conclusion he expressed or that his testimony was inherently incredible; and the witness did not offer an opinion as to defendant's guilt or innocence. N.C.G.S. 8-58.13.

5. Homicide § 15.5— expert opinion testimony—proximate cause of death—admission erroneous—no prejudice

Testimony by a pathologist in a murder prosecution that injuries sustained by the victim during the assault "were a proximate cause of her death" did not constitute a legal conclusion but did constitute testimony that a legal standard had been met, and its admission was therefore error; however, there was no reasonable possibility that, had the error not been committed, a different result would have been reached at trial.

6. Assault and Battery § 4— death resulting from assault—conviction for assault improper

If a victim dies as the result of an assault, a defendant cannot be convicted of assault with a deadly weapon inflicting serious injury for that particular assaultive conduct; therefore, defendant's conviction for assault with a

deadly weapon inflicting serious injury is vacated since the State failed to introduce evidence of an assault which did not result in the victim's death.

**7. Criminal Law § 138; Larceny § 10— sentence—clerical error—improper aggravating factors**

Defendant is entitled to a new sentencing hearing on his felonious larceny conviction where the State contended that a mere clerical error resulted in the file number of the first degree murder offense being placed on the Findings form and that the trial judge intended his findings to relate only to the felonious larceny conviction, thus properly escalating the punishment to the ten year maximum, but if there was a clerical error, the trial judge erred by finding two aggravating circumstances—that the victim was very old and that the offense was especially heinous, atrocious, and cruel—which were, under the facts of this case, totally unrelated to the crime of felonious larceny, and if there was no clerical error, the trial judge clearly erred by sentencing defendant to a term in excess of the presumptive sentence without making written findings in aggravation and mitigation.

BEFORE *Burroughs, J.,* at the 16 April 1984 Criminal Session of Superior Court, HAYWOOD County. Defendant was convicted of first-degree murder, first-degree burglary, felony larceny, and assault with a deadly weapon inflicting serious injury. The death-qualified jury recommended life imprisonment for the conviction of first-degree murder committed during the perpetration of first-degree burglary. On the Judgment and Commitment form, it appears that the assault conviction was consolidated for sentencing with the first-degree murder, and the judge sentenced defendant to life imprisonment upon the jury's recommendation. Defendant was separately sentenced to a consecutive term of ten years for the larceny conviction. Defendant appeals his life sentence as a matter of right pursuant to N.C.G.S. § 7A-27(a). His motion to bypass the Court of Appeals on his appeal of the ten-year sentence was allowed by this Court on 14 March 1985. Heard in the Supreme Court 17 October 1985.

*Lacy H. Thornburg, Attorney General, by Tiare B. Smiley, Assistant Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

MEYER, Justice.

The State's evidence tended to show that on Saturday morning, 23 July 1983, Charlotte Henson drove down Pisgah Drive in Canton past the home of Nora Curtis, her husband's grandmother,

as she did every day on her way to work. On that morning, how-
ever, she noticed that the front window of Mrs. Curtis' home was
broken. When she arrived at work, Mrs. Henson telephoned her
brother-in-law, Stanley Henson, and asked him to check on his
grandmother.

Stanley Henson drove to Mrs. Curtis' house, and when there
was no response to his knock on the front door, he moved to the
broken window and called out to his grandmother. He heard her
moan and say that she was hurt. He then drove to the Canton
Police Department and advised the dispatcher to send a patrol
car to Mrs. Curtis' home immediately. He returned to his grand-
mother's home, arriving at the same time as Officer R. G. Stroup.
Unable to gain entry through the locked front door, the men
walked around to the side screen door which was secured by a
hook and eye latch. Officer Stroup was able to force open the
screen door, and the two men entered the house. A third door
leading to the basement was locked from the inside.

The men found 87-year-old Nora Curtis in her nightgown, ly-
ing on her side on the bed which was partially broken down at
the foot. On the bedroom floor, they found an old aluminum pot
and a piece of curtain rod with a jagged end. Both items were
stained with a reddish-brown material. There was blood on Mrs.
Curtis' hands, arms, and face and on the pillow, bedcover, and
mattress. Mrs. Curtis had bruises on her hands, arms, and face
and a large knot on her left shoulder. The bedroom appeared to
have been ransacked, and the doors of a wooden wardrobe were
hanging open. Mrs. Curtis was taken to the Haywood County Hos-
pital where she remained until her death on 3 August 1983.

An investigation of the Curtis home was conducted by the
Canton Police Department and the SBI. A small, white cardboard
box was found on top of the dresser in Mrs. Curtis' bedroom. It
contained several items, including the butt of a Marlboro Light
cigarette. Mrs. Curtis did not smoke. A piece of asphalt was found
in the living room. Broken glass was found on the living room
floor between the broken window and the couch. The curtain rod
on the front window was broken down and one of the curtains
was lying on the living room floor. When Sergeant Rhinehart
picked up the curtain, he discovered a footprint on a portion of
the backside or window side of the curtain that had been folded

under before he picked it up. SBI Agent Elliott was able to lift only two fingerprints from the scene, neither of which, when analyzed by the SBI latent print examiner, was found to be of suitable quality for identification purposes.

Mrs. Rochelle Robinson, a daughter of the victim, testified that on the Wednesday prior to the assault, she had driven her mother to the Clyde Savings and Loan to make a $1,500 deposit. Mrs. Robinson further stated that her mother had "at least five hundred dollars left," which she placed in a large plastic mayonnaise jar in the bedroom wardrobe "where she always kept it." Mrs. Robinson said her mother put "a couple of hundreds and some fifties and some twenties" in the mayonnaise jar. During the crime scene investigation, Officer Stroup found one twenty-dollar bill and some change in a jar inside the wardrobe; neither the plastic mayonnaise jar nor any other money was found in the house during the investigation.

The State also presented the testimony of Gene Ledford, the defendant's cousin. Ledford testified that at approximately 2:00 a.m. on 23 July, he and his stepfather were standing outside the Road Runner, a local store, when they saw the defendant. The defendant came over to them and displayed a roll of paper money. He said the money had been given to him by a man named Bryson so that they would not "rat" on him about the "gun deal." Shortly thereafter, the defendant walked away in the direction of his home.

Larry Kuykendall, a cab driver, testified that he was driving down Pisgah Drive just before 2:00 a.m. on 23 July. He stated that at that time, he saw the defendant, whom he knew well, stepping onto the sidewalk in front of Mrs. Curtis' house. Kuykendall stated that he waved at the defendant but that the defendant did not acknowledge him. He also testified that he saw the defendant push something up underneath the plaid flannel shirt he was wearing.

Sergeant Troy Rhinehart of the Canton Police Department testified that on the evening of 23 July 1983, the defendant accompanied him and Lieutenant Scott Ashe to police headquarters where defendant was advised of his constitutional rights and informed that the officers were investigating the break-in and assault at Mrs. Curtis' home. Defendant stated that he knew

nothing about the incident and that he had been at the Game Room that night and had returned to his home at approximately 11:00 p.m. While defendant was being questioned at the police station, the officers asked him to put his feet on the desk so that they could look at the soles of the boots he was wearing. The officers visually compared the tread on defendant's boots with the footprint on the curtain taken from Mrs. Curtis' house. Defendant agreed to give the officers his boots and the clothing he was wearing. The officers accompanied defendant back to the mobile home where he was living so that he could change clothes. In the bedroom of the mobile home, the officers noticed an ashtray containing cigarette butts. Defendant agreed to allow the officers to take the cigarette butts.

Rhinehart further testified that on 24 July, he spoke with Gene Ledford and Larry Kuykendall. The police then obtained warrants for defendant's arrest. They went to defendant's home very early on Monday morning, 25 July 1983; when two officers knocked on the front door, defendant ran out the back door where he was stopped by Sergeant Rhinehart. The officers searched the defendant and found $422.49 in his pockets. Defendant stated that he had earned the money mowing yards and doing other work.

Mrs. Curtis remained in the hospital following the assault. She had recovered sufficiently by 30 July 1983 that the attending physician, Dr. Bill Owen, left her in the care of Dr. Stuart Harley while Dr. Owen took his vacation. Mrs. Curtis began receiving physical therapy in the hospital, but her condition worsened and she died on 3 August 1983. Dr. Robert Boatright, a pathologist, performed an autopsy on Mrs. Curtis. He testified that Mrs. Curtis' death was caused by a blood clot that had formed in her leg and, in passing through her body, became lodged in the major artery from her heart to her lungs. In his opinion, the injuries Mrs. Curtis suffered in the assault caused her death because they resulted in a decrease in her usual activities, thereby restricting the movement of the muscles in her legs that would pump the blood out of the veins in her legs.

The defendant testified that he lived with his parents in Canton and had known the deceased, Mrs. Curtis, all his life, had been in Mrs. Curtis' home on a number of occasions, and had done odd jobs for her in the past. He last visited her home approx-

imately three to four weeks prior to the assault. Defendant further testified that he had gone to his girlfriend's house on the night of 23 July and stayed until 1:30 a.m., although police officer Grant Parrott testified in rebuttal that he had seen the defendant and three others drinking beer behind a feed store on Penland Street at approximately 10:45 p.m. Defendant testified that he went from his girlfriend's house to the Road Runner by walking down Academy Street and that he was not on Pisgah Drive that night.

On the Judgment and Commitment form, it appears that defendant was sentenced to life imprisonment on the consolidated charges of first-degree felony murder and assault with a deadly weapon inflicting serious injury. He was separately sentenced to a consecutive ten-year term on his conviction for felonious larceny.

Defendant has brought forward four issues for review by this Court. First, he argues that the evidence presented at trial was insufficient to support convictions for any of the offenses with which he was charged. Second, he contends that the trial court erroneously admitted testimony of the State's pathologist that the injuries inflicted on the decedent on 23 July 1983 were the proximate cause of her death because that testimony constituted an opinion as to a question of law and as to the ultimate issue in the case. Third, defendant argues that the trial court erred in sentencing him to a term of imprisonment in excess of the presumptive term for the felonious larceny by failing to make findings in aggravation or mitigation of punishment. Finally, defendant urges this Court to reconsider its ruling in several recent cases and find that the imposition of a sentence based upon a verdict of guilty returned by a jury drawn from a venire from which potential jurors were excluded because of their scruples against capital punishment deprives defendant of his right to due process of law and his right to trial by jury. We find no error in the guilt phase of defendant's trial, but remand the case to the trial court for a new sentencing hearing on defendant's conviction for felonious larceny. We also vacate the defendant's conviction for assault with a deadly weapon inflicting serious injury.

I.

Defendant was charged in an indictment, proper in form, with the first-degree murder of Mrs. Nora Curtis. The indictment alleges that a burglary and an assault occurred on 23 July 1983 resulting in the death of Mrs. Curtis on 3 August 1983. This indictment, drawn in accordance with N.C.G.S. § 15-144 (1983), is sufficient to sustain a conviction of first-degree murder committed in the perpetration of the felony of first-degree burglary. *See State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied*, 456 U.S. 932, 72 L.Ed. 2d 450 (1982); *State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, 434 U.S. 928, 54 L.Ed. 2d 288 (1977); *State v. Lee*, 277 N.C. 205, 176 S.E. 2d 765 (1970). The trial judge instructed the jury on a theory of felony murder, naming first-degree burglary as the underlying felony, and the jury returned a verdict of guilty on that theory. If the evidence presented at trial was insufficient to support a conviction of first-degree burglary, the judgment of conviction of first-degree felony murder based on that underlying felony cannot be sustained. *State v. Forney*, 310 N.C. 126, 310 S.E. 2d 20 (1984). Defendant contends that his conviction for first-degree murder must be reversed because the State failed to prove beyond a reasonable doubt each and every element of the underlying felony, first-degree burglary. For the reasons set forth below, we hold that the State carried its burden of presenting substantial evidence of each essential element of the offense of first-degree burglary and of defendant's identity as the perpetrator so as to withstand defendant's motions to dismiss. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980).

The elements of the crime of burglary in the first degree are: (1) the breaking (2) and entering (3) in the nighttime (4) into a dwelling house or a room used as a sleeping apartment (5) of another (6) which is actually occupied at the time of the offense (7) with the intent to commit a felony therein. *State v. Harold*, 312 N.C. 787, 325 S.E. 2d 219 (1985). Defendant here contends that the State failed to prove that the offense was committed in the nighttime and that, therefore, the offense did not constitute burglary and thus could not support a felony-murder conviction. When the State fails to produce substantial evidence that the offense occurred during the nighttime, a defendant is entitled to have charges of burglary against him dismissed. *State v. Forney*, 310

N.C. 126, 131, 310 S.E. 2d 20, 23 (1984); *State v. Smith*, 307 N.C. 516, 518, 299 S.E. 2d 431, 434 (1983). Defendant also argues that the State's failure to prove the commission of the offense in the nighttime precludes its proving the identity of the defendant as the perpetrator of any of the offenses for which he was convicted. We find no merit in these conditions.

A.

There is no statutory definition of "nighttime" for the offense of burglary in North Carolina. *State v. Frank*, 284 N.C. 137, 145, 200 S.E. 2d 169, 175 (1973). North Carolina courts adhere to the common law definition of "nighttime." One of our early considerations of this term is found in *State v. McKnight*, 111 N.C. 690, 16 S.E. 319 (1892). In *McKnight*, Chief Justice Shepherd wrote:

Sir William Blackston (4 Com., 224) says that "anciently the day was accounted to begin only at sunrising, and to end immediately upon sunset; but the better opinion seems to be that if there be daylight or *crepusculum* enough begun or left to discern a man's face withal, it is no burglary. But this does not extend to moonlight, for then many midnight burglars would go unpunished."

*Id.* at 691, 16 S.E. at 320. More recently, this Court has described "nighttime" as that period of time after sunset and before sunrise "when it is so dark that a man's face cannot be identified except by artificial light or moonlight." *State v. Lyszaj*, 314 N.C. 256, 266, 333 S.E. 2d 288, 295 (1985); *State v. Frank*, 284 N.C. 137, 145, 200 S.E. 2d 169, 175 (1973).

Defendant contends that the State's evidence permitted only conjecture and speculation as to whether any breaking or entry was committed in the nighttime. A review of the State's evidence convinces us that it was sufficiently "substantial" to withstand defendant's motions to dismiss and to allow this question of fact to be resolved by the jury. Substantial evidence is the amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *State v. Corbett*, 307 N.C. 169, 297 S.E. 2d 553 (1982).

We note, first, that the State is not limited to proving solely by direct evidence that the breaking and entering was accomplished in the nighttime; this essential element may be shown

by proof of circumstances which convince a reasonable mind of the fact.

> If this were otherwise, many midnight burglaries would go unpunished, for such offenses are always secretly committed, when no one is, or is supposed to be, present to mark the time, and generally when nothing but circumstances can reveal it . . . .
>
> . . . .
>
> . . . Such crimes under such conditions are not committed in broad daylight, but under the security from detection and apprehension which the night affords, when sleep has disarmed the owner and rendered his premises defenseless.

*State v. Richards*, 29 Utah 310, 312, 314, 81 P. 142, 142, 143 (1905).

[1] In the instant case, the State presented sufficient circumstantial evidence that the offense was committed in the "nighttime." First, the record reveals that the last person to see the victim before the assault was her daughter, Edna Henson. Mrs. Henson testified that when she left her mother's house at approximately 3:00 p.m. on Friday afternoon, 22 July 1983, the front window of the house was intact and the living room curtains were hanging straight. When Charlotte Henson saw the window the next morning as she drove to work, the window was broken; the curtain and the broken glass were later found lying inside the room.

Second, Mr. Larry Kuykendall testified that as he drove his taxicab down Pisgah Drive just before 2:00 a.m. on Saturday morning, 23 July, he recognized defendant, whom he had known all of defendant's life, stepping onto the sidewalk in front of Mrs. Curtis' house. Mr. Kuykendall testified that he was driving only five to seven miles per hour and passed within five or six feet of the defendant. He stated that Mrs. Curtis' house is situated only "a couple of feet" from the sidewalk and "just a couple of yards" from the street. Mr. Kuykendall testified that, although he and defendant were well acquainted, defendant did not acknowledge him when he blew his horn and waved in greeting; he saw the defendant put "something up under his shirt" and keep walking. Mr. Kuykendall stated that he noticed that defendant "looked like he was wore out; like he was tired." Thus, the State presented

eyewitness testimony which placed defendant at the scene of the crime at just before 2:00 a.m. on the night in question; Mr. Kuykendall stated that "it was dark" but that there were three streetlights in the vicinity. The jury could reasonably have placed weight on the unrefuted testimony that the defendant refused to acknowledge the friendly greeting of a lifelong acquaintance and, instead, pushed something up under his shirt and kept walking toward town.

The third important link in the State's chain of circumstantial evidence tending to prove that the offense was committed in the nighttime was the testimony of defendant's cousin, Gene Ledford, who was waiting at the Road Runner for his paper route newspapers to be delivered in the early morning hours of Saturday, 23 July 1983. Ledford testified that at around 2:00 a.m., he saw the defendant walking toward the Road Runner from the direction of Pisgah Drive. Ledford and defendant's stepfather both testified that defendant came over to where they were standing with a group of friends and displayed a roll of paper money. Neither man knew how much money was in the roll, but they saw several twenty-dollar bills and some one-dollar bills. The defendant told these men that a man named Bryson gave him the money "in the gun deal" so that they would not "rat" on him. This evidence places the defendant on foot "a good mile" from Pisgah Drive sometime around 2:00 a.m. on 23 July 1983, and flashing a substantial sum of paper money.

The fourth relevant piece of evidence was the testimony of Stanley Henson, the victim's grandson who found his grandmother bleeding and bruised in her bloodstained bed shortly after 9:00 a.m. on 23 July. Mr. Henson testified that when he found Mrs. Curtis, she was wearing her pajamas and was lying on her side in her bed which had been broken down at the foot. While, in *State v. Forney*, 310 N.C. 126, 310 S.E. 2d 20 (1984), we found evidence that the victim had been discovered barefoot and wearing her nightgown outside her home early in the morning was insufficient in and of itself to take the determination of the time of entry into the victim's home out of the realm of speculation and conjecture, such evidence is certainly probative, especially in light of the other evidence presented. Just as the evidence of the attire of the victim in *Forney* was not dispositive on these facts, it is not dispositive here, but it may appropriately be considered among

other circumstantial evidence on the question of whether the offense occurred during the nighttime.

Finally, we note that the defendant offered several conflicting accounts of his whereabouts on the night in question. He initially told law enforcement officers that he had gone to the Game Room, played a few games, drunk a few beers, then had gone home around 11:00 p.m. At trial, defendant testified that he had gone to his girlfriend's house that night at 9:00 and stayed until 1:30 a.m. when he went home. Defendant did not call his girlfriend to testify on his behalf at trial. In rebuttal, Officer Parrott testified that he had seen the defendant with three other men drinking beer behind a feed store at 10:45 p.m. and had spoken with the defendant at that time.

The State concedes that any individual link in the chain of its circumstantial evidence on the "nighttime" element, taken alone, is probably insufficient to establish that element. It contends, however, and we agree, that the cumulative effect of this evidence, taken as a whole, is sufficiently substantial to withstand defendant's motion to dismiss the burglary charge and to allow the issue to go to the jury for its determination of the question of fact beyond a reasonable doubt. *See generally* Annot., "Sufficiency of showing that burglary was committed at night," 82 A.L.R. 2d 643 (1962).

B.

[2] Defendant next contends that the State failed to present evidence at trial sufficient to withstand his motion to dismiss on the basis that the State had not proved defendant was the person who committed the offenses. Defendant claims that the State's evidence as to the identity of the defendant as the perpetrator was comprised of inference based on inference; such method of inferring a defendant's guilt is not permitted in this State. "A basic requirement of circumstantial evidence is reasonable inference from established facts. Inference may not be based on inference. Every inference must stand upon some clear and direct evidence, and not upon some other inference or presumption." *State v. Byrd*, 309 N.C. 132, 139, 305 S.E. 2d 724, 729 (1983) (quoting *State v. Parker*, 268 N.C. 258, 262, 150 S.E. 2d 428, 431 (1966) ).

The State presented no direct evidence which placed the defendant *inside* the victim's house during the nighttime hours of 23 July 1983. However, the State produced direct evidence that defendant had been inside the victim's house at some time and that defendant was seen stepping onto the sidewalk one or two feet from the house at 2:00 a.m. on 23 July 1983 and that defendant displayed a large sum of money very shortly thereafter.

The State presented four important "established facts" which, taken together, lead to the reasonable inference that the defendant committed the offenses for which he was convicted. First, the State tendered the expert testimony of SBI crime laboratory latent evidence expert, Ricky Navarro. Mr. Navarro compared the shoe print found on the window side of the curtain from the victim's living room with the sole of the left boot defendant admitted he was wearing on the night in question. His comparison of the unique characteristics of the print and the sole of the boot led him to the conclusion that the print was made by defendant's left boot and by no other shoe. Defendant attacks this evidence on grounds that it does not meet the three-part test for the sufficiency of such circumstantial evidence set forth in *State v. Palmer*, 230 N.C. 205, 213, 52 S.E. 2d 908, 913 (1949), and clarified in *State v. Jackson*, 302 N.C. 101, 273 S.E. 2d 666 (1981).

[3]  When the sufficiency of shoe print evidence is raised on appeal, the Court must determine whether the *Palmer* "triple inference" test has been met by the evidence presented at trial:

> In the nature of things, evidence of shoeprints has no legitimate or logical tendency to identify an accused as the perpetrator of a crime unless the attendant circumstances support this triple inference: (1) that the shoeprints were found at or near the place of the crime; (2) that the shoeprints were made at the time of the crime; and (3) that the shoeprints correspond to shoes worn by the accused at the time of the crime.

*Palmer*, 230 N.C. at 213, 52 S.E. 2d at 913. Although "it is not necessary that a witness be qualified as an expert to entitle him to testify as to the identity of shoe prints and their correspondence with the shoes worn by a defendant," *State v. Adkinson*, 298 N.C. 673, 680, 259 S.E. 2d 858, 863 (1979), Mr. Navarro was qualified as an expert in latent print identification. He

testified at great length and in great detail as to the basis of his conclusion that the boot print found on the curtain was made by defendant's left boot and by no other.

> "No doubt a witness to identity of footmarks should be required to specify the features on which he bases his judgment of identity; and then the strength of the inference should depend on the degree of accurate details to be ascribed to each feature and of the unique distinctiveness to be predicated of the total combination. . . ." Wigmore on Evidence (3rd Ed.), section 415.

*Palmer*, 230 N.C. at 214, 52 S.E. 2d at 914. There is no doubt that the first *Palmer* inference is sufficiently supported by the evidence at trial; the boot print was discovered on the backside or window side of a curtain lying on the floor of the victim's living room, "at or near the place of the crime." Likewise, there is no doubt that the third *Palmer* inference is supported by the evidence; the expert's testimony was that the imprint could have been made by no other shoe. Defendant seems to be arguing that, because he testified at trial that he had made the boot print weeks earlier during a visit in the victim's home, the State failed to provide a sufficient basis for the second *Palmer* inference, thus causing the State's identity evidence to fail under *Palmer*.

In *State v. Long*, 293 N.C. 286, 237 S.E. 2d 728 (1977), as here, investigators were unable to state that a shoe print was made at the time of the crime although they were able to positively state that the print was made by defendant's shoe. The rationale in *Long* for finding that the second *Palmer* inference had been met is applicable here:

Although both Officers Van Isenhour and Mooney admitted on cross-examination that the shoe print could have been made a month prior to the crime, Officer Mooney's testimony on direct examination that the shoe print corresponded with shoes taken from defendant at the time of his arrest was clearly competent as tending to connect the accused with the crime. The question whether the shoe print could have been impressed only at the time the crime was committed is a question of fact for the jury, not a question of law to be determined by the court prior to the admission of the evidence. *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977).

*Long,* 293 N.C. at 296, 237 S.E. 2d at 734. Therefore, because the State presented evidence tending to connect defendant with the scene of the crime at or about the time the offenses were committed, including evidence that defendant was seen directly in front of the victim's home at 2:00 a.m. on the night in question, and that defendant admitted he was wearing the boots corresponding to the print found on the curtain inside the victim's home, there is strong evidence that the footprint was made at the time of the burglary. The curtain on which the print was found had been pulled down from over the window which the intruder broke and through which he entered. According to the daughter's testimony, the curtain was hanging over the window the day before. The location of the print on the back (or window) side of the curtain was consistent with the intruder having stepped on the back of the curtain as he entered through the broken window. The question of whether the print was impressed at the time the crime was committed was a question of fact properly left to the jury. Assuming, *arguendo,* that the "triple inference" test of *Palmer* is required to be met when the shoe print evidence is proved by an expert, that test was met in this case, and defendant's contention that this evidence was insufficient as a matter of law has no merit.

The second important piece of circumstantial evidence connecting defendant with the crimes is the testimony of Mrs. Jona Medlin, SBI forensic serologist. Mrs. Medlin examined cigarette butts taken from defendant's home and the cigarette butt found in the victim's bedroom. She compared saliva from those cigarette butts and concluded that the saliva was produced by a person who is a "type A secretor." Mrs. Medlin's analysis of a sample of defendant's blood revealed that defendant is a type A secretor. She testified that thirty percent of the population of North Carolina falls into the type A secretor category. The State's evidence also indicated that the cigarettes were of the same brand.

The third evidentiary link is the testimony of Mr. Larry Kuykendall, the cab driver, who saw the defendant step onto the sidewalk directly in front of the victim's home at 2:00 a.m. and stuff something into his shirt. The State introduced into evidence the checked flannel shirt that the defendant admitted that he was wearing on the night in question. Mr. Kuykendall stated that the

shirt appeared to be the shirt defendant was wearing when Mr. Kuykendall saw him.

Finally, the State offered the testimony of defendant's cousin, Gene Ledford, who stated that he had seen the defendant around 2:00 a.m. on 23 July 1983 and that defendant was displaying a roll of paper money at that time. Ledford spoke with the defendant only minutes after Kuykendall had observed defendant step onto the sidewalk just in front of the victim's house. When defendant was arrested in the early hours of 25 July 1983, he had in his possession over $400.00, consisting of a one-hundred-dollar bill, four fifty-dollar bills, six twenty-dollar bills, and a one-dollar bill. The victim's daughter, Mrs. Rochelle Robinson, testified that she saw her mother leave $500.00, consisting of a couple of one-hundred-dollar bills, several fifty-dollar bills, and several twenty-dollar bills in a jar on the Wednesday prior to the assault. We find this evidence concerning defendant's possession of a large sum of money to be competent on the issue of whether defendant was the perpetrator of the offenses and that the weight and credibility of the evidence were properly before the jury. *See, e.g., State v. Puckett*, 211 N.C. 66, 74, 189 S.E. 183, 188 (1937); *State v. Madden*, 292 N.C. 114, 232 S.E. 2d 656 (1977). *See generally* Annot., "Evidence of acquisition or possession of money; source of which is not traced as admissible against defendant in criminal case," 91 A.L.R. 2d 1046 (1963).

In sum, therefore, we hold that from the four important "established facts" offered by the State (the boot print evidence, the blood type evidence, the cab driver's statements, and the testimony of defendant's cousin), reasonable inferences could be drawn that the defendant was present inside the victim's house on the night in question and that he was the perpetrator of the offenses for which he was convicted. The defendant's motion to dismiss the charges was correctly denied.

II.

Defendant's next contention is that the trial court erred in allowing the State's pathologist, Dr. Robert Boatright, to testify that, in his opinion, the injuries suffered by the victim on 23 July 1983 "were a proximate cause of her death." Defendant argues that it was error to admit this testimony for two reasons: the statement constituted (1) an opinion as to the ultimate issue for

the jury and (2) a legal conclusion. For the reasons stated below, we find no error in the admission of this testimony.

Dr. Boatright was tendered by the State and accepted without objection as an expert in the fields of pathology and medicine. He performed a post-mortem examination of the victim on 3 August 1983. During his direct examination at trial, the following exchange took place:

Q. Dr. Boatright, do you have an opinion as a medical doctor, satisfactory to yourself, as to whether or not the trauma injuries that Nora Curtis had on the 23rd day of July, 1984 [sic], were a proximate cause of her death?

MR. COWEN: Objection.

THE COURT: Overruled.

Q. And what is that opinion?

A. My opinion is that they were a proximate cause of her death. May I explain the reasoning—

[4] Defendant argues, first, that it was error to admit this expert testimony unqualified by the terms "could" or "might." Defendant's contention is that, because the testimony was not limited by these terms, it amounted to an expression of opinion as to an ultimate issue in the case and invaded the province of the jury. Defendant relies on *State v. Keen*, 309 N.C. 158, 305 S.E. 2d 535 (1983), and *State v. Brown*, 300 N.C. 731, 268 S.E. 2d 201 (1980), for the proposition that expert medical testimony is properly admitted when "the witness testifies only that an event *could* or *might* have caused an injury but does not testify to the conclusion that the event did in fact cause the injury, unless his expertise leads him to the unmistakable conclusion . . . ." *Keen*, 309 N.C. at 163, 305 S.E. 2d at 538; *Brown*, 300 N.C. at 733, 268 S.E. 2d at 203 (emphasis in original).

Defendant did not object at trial to Dr. Boatright's qualification as an expert and does not now explain why Dr. Boatright's expertise limited him to forming an opinion only as to what could or might have caused the victim's death. Defendant's bare contention is that Dr. Boatright's expertise qualified him only *to state* what *could* or *might* have caused the victim's death, citing *Patrick v. Treadwell*, 222 N.C. 1, 21 S.E. 2d 818 (1942). The rule

in *Patrick* has been clarified by modern case law and by statute. In *Patrick*, the medical expert testified that a second fracture of plaintiff's previously broken arm had, in fact, been caused by a car accident when there was no medical certainty that this was so. In *Mann v. Transportation Co. and Tillett v. Transportation Co.*, 283 N.C. 734, 198 S.E. 2d 558 (1973), this Court said:

> [A]n expert witness should be allowed "to make a positive assertion of causation when that conforms to his true opinion, reserving 'could' and 'might' for occasions when he feels less certainty"; . . . if the expert witness, "though holding a more positive opinion, is forced to adopt the 'could' or 'might' formula, then the result is patently unjust, unless the more positive opinion may be said to be inherently incredible."

*Id.* at 748, 198 S.E. 2d at 568 (citations omitted). The Court went on to explain that "[w]hen a jury's inquiry relates to cause and effect in a field where special knowledge is required to answer the question, the purpose of expert testimony is likely to be thwarted or perverted unless the expert witness is allowed to express a positive opinion (if he has one) on the subject." *Id. See also State v. Morgan*, 299 N.C. 191, 205, 261 S.E. 2d 827, 835 (1980); *State v. Wilkerson*, 295 N.C. 559, 571, 247 S.E. 2d 905, 912 (1978); *Taylor v. Boger*, 289 N.C. 560, 565, 223 S.E. 2d 350, 353 (1976); Comment, *Expert Medical Testimony: Differences Between the North Carolina Rules and Federal Rules of Evidence*, 12 Wake Forest L. Rev. 833, 847-49 (1976).

The shift in emphasis away from the question of whether expert testimony "invades the province of the jury" or expresses an opinion as to "an ultimate issue" is further evidenced by the General Assembly's enactment in 1981 of N.C.G.S. § 8-58.12 and N.C.G.S. § 8-58.13 (repealed by 1983 N.C. Sess. Laws ch. 1037, § 9). Those statutes discard the formerly required use of the hypothetical question and permit an expert witness to testify in the form of an opinion if his or her scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.

Here, the trial court properly allowed Dr. Boatright to express his positive opinion as to the cause of the victim's death, unqualified by the terms "could" or "might." The trial judge, after accepting Dr. Boatright as an expert in pathology, properly con-

cluded, pursuant to N.C.G.S. § 8-58.13, then in effect, that Dr. Boatright's testimony would assist the jury in understanding his testimony and in determining a fact in issue. Defendant offered no evidence to the effect that Dr. Boatright's expertise could not lead him to the conclusion he expressed or that his testimony was "inherently incredible." The cases relied upon by defendant state that "could" or "might" must be used only when the witness' expertise cannot lead him to an "unmistakable conclusion." *Keen,* 309 N.C. at 163, 305 S.E. 2d at 538; *Brown,* 300 N.C. at 733, 268 S.E. 2d at 203. We also note that Dr. Boatright did not offer an opinion as to defendant's guilt or innocence. *Brown,* 300 N.C. at 735, 268 S.E. 2d at 204. Therefore, defendant's contention that Dr. Boatright's testimony as to the cause of Mrs. Curtis' death was improperly admitted as an expression of opinion as to an ultimate issue and thus invaded the province of the jury is without merit. *See also* N.C.G.S. § 8C-1, Rule 704 (effective 1 July 1984).

[5] Defendant's second basis for challenging admission of this testimony is that it *constituted a legal conclusion.* Defendant also seems to argue that Dr. Boatright's use of the term "proximate cause" in his answer to the prosecutor's question was improper because it *constituted testimony that a legal standard had been met.* Defendant seems to base this argument on a statement in 1 Brandis on North Carolina Evidence § 126, n.55 (2d rev. ed. 1982) to the effect that the principle excluding opinions on matters of law "clearly bars opinion that a criminal defendant is 'guilty' or that a civil defendant was 'negligent' or that *conduct was a 'proximate cause' of injury."* (Emphasis added.)

We have very recently stated that even under the new rules of evidence, an expert may not testify that a particular legal conclusion or standard has or has not been met, at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness. *State v. Smith,* 315 N.C. 76, 337 S.E. 2d 833 (1985).

Dr. Boatright was the pathologist who examined the body of the deceased on autopsy. He testified that he found, *inter alia,* an embolus, or blood clot, blocking the major arteries from the heart to the lungs, resulting in her death. Then followed the portion of his testimony which is the subject of defendant's argument:

Q. Do you have an opinion, Dr. Boatright, satisfactory to yourself as to what caused the death of Mrs. Curtis?

A. Yes sir, a clot of blood moved from her vessels, the veins in her legs, through her heart and to the artery to the lungs and blocked it.

Q. What does that do, sir?

A. This dams up the flow of blood. And does not let the blood go around it. Almost as if you would drive a cork into the artery.

Q. Dr. Boatright, you heard the testimony here a few minutes ago of Dr. Bill Owen, is that correct?

A. Yes sir, I did.

Q. Did you hear his description of the trauma, the injury, that Mrs. Curtis — that he observed on Mrs. Curtis on July 23rd?

A. Yes sir, I did.

Q. Did you hear his testimony as to her condition in the hospital and the course of her stay in the hospital?

A. Yes sir, I did.

Q. Dr. Boatright, do you have an opinion as a medical doctor, satisfactory to yourself, as to whether or not the trauma injuries that Nora Curtis had on the 23rd day of July, 1984 [sic], were a proximate cause of her death?

MR. COWEN: Objection.

THE COURT: Overruled.

Q. And what is that opinion?

A. My opinion is that they were a proximate cause of her death. May I explain the reasoning—

Q. Yes sir, I would ask you the basis for that opinion?

A. The blood circulates in the body with no intrinsic pump or no pressure behind it, different from the arteries. The legs are the fartherest [sic] from the heart. The blood in

these vessels in the legs is lying there. And the movement of muscles surrounding these vessels propels this blood to the heart normally — comes under very low pressure, but the muscles and activity keep the blood flowing. When a person, particularly an old person, is put into bed this blood does not move because the muscles are not moving. It begins to stagnate, particularly in areas where the valves are partial — valves to aid in the flow of blood to permit it to go only one way towards the heart. Due to this settling of blood, a clot forms. This clot will set there in this vessel. It will grow because it has blocked the blood near the heart. The smaller veins distal to it become clogged up. In some instances, as it did in this case, the clot breaks loose. When it breaks loose, it flows through the body. The veins become larger as it goes from the legs to the heart; so there is no obstruction. However, once you go through the heart and back out to the lungs, the vessel is much smaller leaving the heart than the vessel entering the heart. Therefore, the — if we may say, it's like a cork or log in a river; when it gets to the narrow part, it plugs up the flow. This plugs up the flow and for all practical purposes stops the circulation of blood, resulting in death.

Q. How did the trauma injuries contribute to that?

A. They stopped her having her usual activity — being up and around. They put her in the hospital in pain, unable to move or painful for her to move; very much restricted the use of her legs; therefore the use of the muscle pumping the veins to get the blood out of her legs.

Q. Thank you, sir. That would be all.

In addition to his objection, the defendant moved to strike this testimony as "not being based on any opinion based on medical expertise." The trial judge denied the motion.

We first address defendant's argument that Dr. Boatright's testimony constituted a legal conclusion. The well-established rule is that opinion testimony to the effect that a defendant's *conduct* caused injury or death is clearly inadmissible as a legal conclusion. However, Dr. Boatright did not attempt to state an opinion as to any *conduct* which caused Mrs. Curtis' death; he merely

gave his expert medical opinion that the *injuries* he observed were the proximate cause of Mrs. Curtis' death. This testimony relates to a *medical* conclusion which Dr. Boatright was fully qualified to make. It clearly did not address a *legal* conclusion or standard. Dr. Boatright could not and did not testify that, in his opinion, defendant's alleged *conduct* on 23 July caused Mrs. Curtis' subsequent death on 3 August. That question was properly left to the jury.

Next, we address defendant's argument that Dr. Boatright's use of the term "proximate cause" constituted testimony that a legal standard had been met. We observe that the question related to whether the *trauma injuries* of 23 July were a "proximate cause" of death. In effect, the question asks, "Was the blood clot, which you conclude was the cause of death, caused by the trauma injuries, and therefore were the trauma injuries a proximate cause of death?" Dr. Boatright responded directly to the question in the affirmative and even employed the term "proximate cause." The prosecutor's question incorporated the term "proximate cause," a legal standard familiar to lawyers. In Black's Law Dictionary 1103 (5th ed. 1979), we find "proximate cause" defined as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred." The "popular" meaning of the term "proximate cause" is approximately the same as the legal meaning. Webster's Third New International Dictionary 1828 (1966) defines "proximate cause" as "a cause which directly or with no mediate agency produces an effect; . . . ."

We conclude that this portion of Dr. Boatright's testimony did purport to state that a legal standard had been met and its admission was therefore error. We also conclude, however, that this error was not so prejudicial as to warrant a new trial. After answering the prosecutor's question in the affirmative, Dr. Boatright asked, and was permitted, to explain his reasoning. He explained, in considerable detail, that Mrs. Curtis' being bedridden caused a clot to form which traveled to the lung and lodged there, stopping the circulation of blood and resulting in death.

This explanation does not address the relationship between the conduct of the defendant and the death, but relates only to

the relationship among the deceased's bedridden condition, the blood clot, and her death. Dr. Boatright had previously been permitted to give testimony without objection, that the cause of death was the pulmonary embolus or blood clot. We conclude that though the admission of the prosecutor's question and Dr. Boatright's brief affirmative answer was error, there is no reasonable possibility that, had the error not been committed, a different result would have been reached at the trial. N.C.G.S. § 15A-1443 (1983).

### III.

The defendant's next argument concerns the ten-year sentence he received on the felonious larceny conviction.

The defendant was convicted of first-degree murder under the felony-murder rule with the underlying felony being the first-degree burglary. He was also convicted of first-degree burglary, assault with a deadly weapon inflicting serious injury, and felonious larceny. After the jury recommended life imprisonment for the first-degree murder, the defendant was sentenced on the various charges.

The murder, burglary, and assault convictions were listed on one Judgment and Commitment form; the felonious larceny conviction was placed on another form. The trial judge went on to state that the burglary and assault convictions merged with the first-degree murder conviction as a matter of law. On a Findings form which listed the file number of the murder charge, 83CRS4979, the trial court found three aggravating circumstances: that the offense was especially heinous, atrocious, or cruel; that the victim was very old; and that the defendant has a prior conviction or convictions for criminal offenses punishable by more than sixty days confinement. The trial court found no mitigating circumstances. The defendant was then sentenced to the mandatory term of life imprisonment for the first-degree murder conviction.

On the felonious larceny charge, the trial judge stated that he found the aggravating circumstances outweighed the mitigating circumstances, and he imposed the maximum ten-year sentence, which was ordered to run consecutive to the life sentence. However, the trial judge failed to list the findings in aggravation

and mitigation on the Judgment and Commitment form which contained the felonious larceny charge.

[6]  Initially, we note that although the Judgment and Commitment form might tend to give the impression that the burglary conviction was consolidated for sentencing with the first-degree murder conviction, this is not what actually occurred. The sentencing hearing transcript reveals that the trial judge stated, "The first degree burglary and the assault, of course, by law merge into the murder charge." This statement clearly indicates that the trial judge recognized that the burglary, being the underlying felony, merged with the first-degree murder conviction. The trial judge, however, was incorrect in stating that the assault "merged" into the murder charge. We conclude that under the facts of this case, the defendant could not be convicted of assault with a deadly weapon inflicting serious injury.

Prior to 1969, N.C.G.S. § 14-32 (1953) provided:

*Assault with deadly weapon with intent to kill resulting in injury.*— Any person who assaults another with a deadly weapon with intent to kill, and inflicts serious injury not resulting in death, shall be guilty of a felony and shall be punished by imprisonment in the State prison or be worked under the supervision of the State Highway and Public Works Commission for a period not less than four months nor more than ten years.

In order to obtain a conviction under this statute, the State was required to prove the following elements: (1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) resulting in the infliction of serious injury, (5) *which falls short of causing death. State v. Meadows*, 272 N.C. 327, 158 S.E. 2d 638 (1968); *State v. Jones*, 258 N.C. 89, 128 S.E. 2d 1 (1962). It was therefore clear that if the assault resulted in the death of the victim, the defendant could not be convicted of this offense, as one of the essential elements of the crime would be lacking.

In 1969, the statute was amended to provide:

*Assault with a firearm or other deadly weapon with intent to kill or inflicting serious injury; punishments.*— (a) Any person who assaults another person with a firearm or other

State v. Ledford

deadly weapon of any kind with intent to kill and inflict serious injury is guilty of a felony punishable under G.S. 14-2.

(b) Any person who assaults another person with a firearm or other deadly weapon per se and inflicts serious injury is guilty of a felony punishable by a fine or imprisonment for not more than five years, or both such fine and imprisonment.

(c) Any person who assaults another person with a firearm with intent to kill is guilty of a felony punishable by a fine or imprisonment for not more than five years, or both such fine and imprisonment.

Subsequent amendments deleted the word "firearm" and altered the degree of punishment which could be imposed. 1971 N.C. Sess. Laws ch. 765, § 1; 1973 N.C. Sess. Laws ch. 229, §§ 1-3; 1979 N.C. Sess. Laws ch. 760, § 5. Present N.C.G.S. § 14-32(b) (under which defendant was convicted) provides: "Any person who assaults another person with a deadly weapon and inflicts serious injury shall be punished as a Class H felon."

In a case arising after the 1969 amendment, we said that under N.C.G.S. § 14-32(b), the term "inflicts serious injury" means a physical or bodily injury resulting from an assault with a deadly weapon which, though serious, falls short of causing death. *State v. Joyner*, 295 N.C. 55, 243 S.E. 2d 367 (1978). Therefore, while the statute no longer expressly articulates the requirement that the assault not result in death, *Joyner* makes it clear that if the State proves to the satisfaction of the jury beyond a reasonable doubt that the assaultive conduct resulted in death, it has disproven the "serious injury" element because "serious injury" necessarily must be injury that falls short of death. If a victim dies as the result of an assault, a defendant cannot be convicted of assault with a deadly weapon inflicting serious injury *for that particular assaultive conduct.*

Here, the evidence clearly shows that the assaultive conduct which formed the basis of the assault charge resulted in the victim's death. No other assault independent of the one causing death took place. Since the State failed to introduce evidence of an assault which did not result in the victim's death, we vacate

the defendant's conviction for assault with a deadly weapon inflicting serious injury.

[7] The defendant also contends that an examination of the record clearly shows that the trial judge violated the Fair Sentencing Act, N.C.G.S. § 15A-1340.4 (1985), in sentencing him to a term in excess of the presumptive for the felonious larceny conviction. Defendant contends that there are two ways of reading this record. First, he suggests that the record could be interpreted as indicating that the trial judge made *no* findings in aggravation or mitigation as to the felonious larceny conviction, yet sentenced defendant to the maximum punishment provided by law for that offense. If that were the case, a failure to make these findings would require that the sentence for felonious larceny be vacated and the case remanded for resentencing. Defendant suggests that another interpretation of the record would infer that the trial judge made findings in aggravation and mitigation for all of the offenses together, without separating them as to each offense. If that were the case, the same result would be reached because this Court has held that separate findings must be made for each offense, even if the cases are consolidated for hearing. *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689 (1983):

> We therefore hold that in every case in which the sentencing judge is required to make findings in aggravation and mitigation to support a sentence which varies from the presumptive term, each offense, whether consolidated for hearing or not, must be treated separately, and separately supported by findings tailored to the individual offense and applicable only to that offense.

*Id.* at 598, 300 S.E. 2d at 698.

Defendant notes that while some or all of the aggravating factors found by the trial judge could possibly be found to be proper in aggravation of the burglary charge, this charge merged by law with the first-degree murder charge. Defendant contends that only one of the aggravating factors—prior convictions punishable by more than sixty days imprisonment—could properly aggravate the felonious larceny conviction; and the other two aggravating factors—that the victim was very old and that the offense was especially heinous, atrocious, or cruel—are unrelated to the felonious larceny charge and are unsupported by the evi-

dence. For these reasons, defendant argues that these factors cannot properly be used to aggravate the offense of felonious larceny.

The State contends that a mere clerical error resulted in the file number of the first-degree murder offense being placed on the Findings form and that the trial judge intended his findings to relate only to the felonious larceny conviction, thus properly escalating the punishment to the ten-year maximum. The State notes that the Judgment and Commitment form for the first-degree murder is marked to indicate that no written findings were made because the prison term imposed is one required by law, i.e., life imprisonment, and that the Judgment and Commitment form for the felonious larceny is marked to indicate that written findings were, in fact, found though they appear on the other sheet. The State contends that those findings are contained in the Findings form which was erroneously marked with the first-degree murder file number. The State also argues that mere clerical error must be responsible for the confusion because the murder conviction is not subject to the Fair Sentencing Act or the presumptive terms set out in that act. N.C.G.S. § 15A-1340.1 (1983). The State suggests that there was no *Ahearn* violation and that this Court should remand the matter to the trial court for an order correcting the clerical error to show the felonious larceny file number on the Findings form.

After a careful examination of the record, we conclude that the defendant is entitled to a new sentencing hearing on the felonious larceny conviction. If there was no clerical error, the trial judge clearly erred by sentencing the defendant to a term in excess of the presumptive sentence without making written findings in aggravation and mitigation. If there was a clerical error, the trial judge still erred by finding two aggravating circumstances—that the victim was very old and that the offense was especially heinous, atrocious, and cruel—which are, under the facts of this case, totally unrelated to the crime of felonious larceny. We therefore vacate the ten-year sentence for the felonious larceny conviction and remand for a new sentencing hearing.

IV.

Finally, defendant contends that the practice of "death-qualifying" the jury before the guilt-innocence phase of his trial

resulted in a jury biased in favor of the prosecution on the issue of guilt and deprived him of a fair trial. We have consistently rejected such arguments. *E.g., State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, --- U.S. ---, 84 L.Ed. 2d 369, *reh'g denied*, --- U.S. ---, 85 L.Ed. 2d 342 (1985); *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, --- U.S. ---, 83 L.Ed. 2d 299 (1984). This assignment of error is without merit.

In summary, then, we hold that the trial court committed no error in the guilt-innocence phase of defendant's trial. We vacate the defendant's conviction for assault with a deadly weapon inflicting serious injury in file number 83CRS4981. We also vacate the ten-year sentence for felonious larceny in file number 83CRS4982 and remand the matter to the Superior Court, Haywood County, for a new sentencing hearing on the felonious larceny conviction.

No. 83CRS4979 — First-degree murder — no error.

No. 83CRS4981 — Assault with a deadly weapon inflicting serious injury — conviction vacated.

No. 83CRS4982 — Felonious larceny — sentence vacated and remanded for resentencing.