STATE OF NORTH CAROLINA v. LARRY ROLANDO LINNEY

No. COA98-1565

(Filed 6 June 2000)

## 1. Embezzlement— indictment—identity of owner of property

An indictment for embezzlement was fatally defective where it alleged that defendant embezzled rental proceeds from an estate. An estate does not constitute a legal entity capable of owning property; the identity of the owner or person in possession should be named in the indictment with certainty to the end that another prosecution cannot be maintained for the same offense.

## 2. Perjury— 90-day estate inventory—misstatement of bank account value

The trial court did not err by denying defendant's motion to dismiss a charge of perjury arising from his listing of a guardianship bank account's value on a 90-day estate inventory. Defendant's misstatement was not a matter of making an incorrect statement or an honest mistake; he had misappropriated $10,000 and listed the account as containing $27,885 rather than the actual $17,885. This was a material statement which was intentionally false and which was made under oath.

## 3. Perjury— instructions—materiality of misstatement

The trial court erred in a perjury prosecution by giving instructions based on the pattern jury instructions, which resolved the issue of materiality for the jury and removed the question from their consideration. The language of the pattern jury instructions must yield to the holding in *United States v. Gaudin*, 515 U.S. 506, that the defendant had a constitutional right to have the jury decide materiality.

## 4. Constitutional Law— privilege against self-incrimination— Bar investigation

The trial court did not err in a perjury prosecution by admitting into evidence statements made by defendant to State Bar investigators of his own volition. Defendant was never warned that he could be disbarred if he failed to cooperate, he was not in custody, the statements were not extracted under the power of a subpoena, and the statements were not part of an answer to a formal inquiry or complaint. While an attorney should cooperate

with State Bar investigations, the choice of whether to cooperate or to invoke the Fifth Amendment privilege is still the attorney's; however, the privilege against self-incrimination is a personal one which must be claimed to be available. Defendant here did not invoke his Fifth Amendment rights until he reached criminal proceedings. Moreover, the Fifth Amendment privilege does not apply to production of records that an attorney is required by law to maintain.

**5. Criminal Law— joinder of offenses—no prejudice**

The trial court did not err by joining for trial 3 counts of embezzling and 3 counts of perjury against an attorney arising from a guardianship where defendant did not show that the offenses were so separate in time and place or so distinct in circumstances as to render a consolidation unjust, and did not show that consolidation prejudiced his ability to present a defense and receive a fair trial.

**6. Evidence— expert testimony—particular violation of fiduciary standards—clerk of court**

There was prejudicial error in an embezzlement and perjury prosecution against an attorney arising from a guardianship in the admission of testimony from the clerk and an assistant clerk as to whether an undocumented loan met the reasonable and prudent standard, whether the failure to list the loan as an asset on the guardian's report would constitute a breach of fiduciary duty, whether it would violate the law for the administrator of an estate to rent property without first obtaining permission from the clerk, and whether it would be illegal to deposit the proceeds into the administrator's personal account. Although not formally tendered as experts, the clerk and assistant clerk were properly considered as such; however, an expert may not testify that a particular legal conclusion or standard has or has not been met.

Appeal by defendant from judgment entered 18 September 1997 by Judge James U. Downs in Buncombe County Superior Court. Heard in the Court of Appeals 21 February 2000.

*Attorney General Michael F. Easley, by Special Deputy Attorney General James C. Gulick, for the State.*

*David G. Belser for defendant-appellant.*

STATE v. LINNEY

[138 N.C. App. 169 (2000)]

EAGLES, Chief Judge.

Defendant was convicted of two counts of embezzlement and two counts of perjury at the 8 September 1997 criminal session of Buncombe County Superior Court.

The evidence presented at trial indicated that in September, 1992, defendant was appointed the guardian of the person and estate of Mrs. Georgiana Alexander, after Mrs. Alexander had been placed in a nursing home. Mrs. Alexander died on 29 June 1994.

In July, 1994, defendant organized a yard sale and sold Mrs. Alexander's household items at 15 Pine Grove Street, Mrs. Alexander's house. At trial, several witnesses testified that they bought items at this sale and paid defendant with both cash and checks for the items. Mrs. Alexander's granddaughter, Ms. Spencer, testified that she never received funds from the sale of these household items. Additionally, Mrs. Sharon Wedlaw testified that defendant rented 15 Pine Grove Street to her family in July, 1994. The Wedlaws paid their rent in checks made payable to defendant personally. Mrs. Alexander's granddaughter testified that she never gave defendant permission to rent out Mrs. Alexander's house.

The North Carolina State Bar investigated the activities of the defendant during 1995 and 1996. As part of this investigation, the defendant provided numerous bank records and summaries of his bank accounts to Mr. Donald Jones, a State Bar investigator. At trial, Mr. Jones testified that Wachovia Bank maintained a guardianship checking account in the name of Mrs. Alexander and administered by defendant. On 20 July 1993, defendant redeemed a $10,000 Wachovia certificate of deposit ("CD") in the name of Mrs. Alexander. Defendant did not deposit the proceeds of this CD into the guardianship checking account. Instead, the proceeds were deposited into the operating account of defendant's law practice.

Additionally, Mr. Jones testified that he had met with agents of the State Bureau of Investigations (S.B.I.) and that he had furnished the S.B.I. investigators copies of defendant's bank documents, including canceled checks, bank statements, and deposit slips from defendant's personal and business accounts. Mr. Jones also provided the S.B.I. with a complete analysis of defendant's bank accounts.

The defendant was indicted for three counts of embezzlement and three counts of perjury. The jury found the defendant guilty of

two counts of embezzlement and two counts of perjury. Defendant appeals.

[1] We first consider whether the trial court erred in denying the defendant's motion to dismiss the charge of embezzlement from the estate of Georgiana Alexander in 96 CRS 8149. Here, the defendant argues that there is a fatal variance between the evidence presented at trial and the indictment. An indictment for embezzlement must allege ownership of the property in a person, corporation or other legal entity capable of owning property. *See State v. Hughes*, 118 N.C. App. 573, 576, 455 S.E.2d 912, 914, *disc. review denied*, 340 N.C. 570, 460 S.E.2d 326 (1995). A defendant may only be convicted of the particular offense charged in the bill of indictment; the allegations in the indictment and proof presented at trial must correspond. *See State v. Rhome*, 120 N.C. App. 278, 298, 462 S.E.2d 656, 670 (1995). A variance between the evidence of ownership presented at trial and the ownership alleged in the indictment invalidates the indictment and requires that the judgment of conviction be vacated. *See State v. Vawter*, 33 N.C. App. 131, 136, 234 S.E.2d 438, 441, *disc. review denied*, 293 N.C. 257, 237 S.E.2d 539 (1977).

Here, the indictment charged that from 22 July 1994 through 2 September 1994, the defendant embezzled the proceeds of the rental of 15 Pine Grove Street. According to the indictment these proceeds belonged to "the estate of Georgiana Alexander." Mrs. Alexander died on 29 June 1994, leaving a will devising 15 Pine Grove Street to her son, George Alexander. Upon Ms. Alexander's death, the home became the property of her son. *See* N.C.G.S. § 28A-15-2. Any proceeds from the rental of the house belonged to George Alexander, and not the estate of Georgiana Alexander, as alleged in the indictment.

However, "[i]n an indictment for larceny the State is not limited to alleging ownership in the legal owner but may allege ownership in anyone else who has a special property interest recognized in law." *State v. Kornegay*, 313 N.C. 1, 27, 326 S.E.2d 881, 900 (1985) (citing *State v. Greene*, 289 N.C. 578, 584, 223 S.E.2d 365, 369 (1976)). The same rule may properly be applied to indictments alleging embezzlement. *See Kornegay*, 313 N.C. at 27, 326 S.E.2d at 900. "It is sufficient if the person alleged in the indictment to be the owner has a special property interest, such as that of a bailee or a custodian, or otherwise has possession and control of it." *State v. Bost*, 55 N.C. App. 612, 616, 286 S.E.2d 632, 635, *disc. review denied*, 305 N.C. 588, 292 S.E.2d 572 (1982). Here, the State argues that an indictment which lists an estate as the owner is sufficient because the estate has a "special property

interest" in that an estate is entitled to seek to have realty sold or rents used to pay the debts of the estate. *See* N.C.G.S. §§ 28A-13-3(27), 28-17-1, and 28-17-11. Although the State's argument appears persuasive, we are bound by the holding of *State v. Jessup*, 279 N.C. 108, 181 S.E.2d 594 (1971).

In *State v. Jessup*, the defendant was indicted for stealing money from his father's estate. The indictment alleged larceny "of the goods, chattels and moneys of the estate of W. M. Jessup, deceased . . . ." The Supreme Court of North Carolina held that this indictment for larceny was fatally defective. In reaching this conclusion, the Court noted that "[t]he estate of a deceased person is not an agency for holding title to property. It is the property itself, to be administered by a personal representative commissioned by the court." *Id.* at 111, 181 S.E.2d at 597. According to the Court, the estate does not constitute a legal entity capable of owning property. Therefore, the Court reasoned, the defendant could be subject to repeated charges of theft from the "estate." The Court concluded that "the identity of the owner or the person in possession of the stolen property should be named in the indictment with certainty to the end that another prosecution cannot be maintained for the same offense." *Id.* at 114, 181 S.E.2d at 598.

This case is indistinguishable from *Jessup*. Accordingly, we conclude that the indictment for embezzlement in 96 CRS 8149 is fatally defective. Defendant's conviction in 96 CRS 8149 must be vacated.

[2] Next, we consider whether the trial court erred by denying defendant's motion to dismiss the charge of perjury in the 90-day inventory of the estate. Under N.C.G.S. § 28A-20-1:

> Every personal representative and collector, within three months after his qualification, shall return to the clerk, on oath, a just, true and perfect inventory of all the real and personal property of the deceased, which have come to his hands, or to the hands of any person for him, which inventory shall be signed by him and be recorded by the clerk.

Here, the State charged defendant with committing perjury in the 90-day inventory of the estate by listing a false value of Mrs. Alexander's checking account. At trial, the State introduced the inventory, which listed, under the caption "Description of Personal Property," a Wachovia checking account with the number 56-6449441, and, under the caption "Value," the figure of $27,885. The document contained the following statement:

I, the undersigned representative, being first duly sworn, say that to the best of my knowledge the following is a just, true and perfect inventory of all assets of the estate named above which have come into my hands or the hands of any person for me as personal representative of the estate.

The State showed that the checking account, at the time of the inventory, contained $17,885. The State asserted separately that the defendant embezzled $10,000 of Mrs. Alexander's money by depositing it into his law firm operating account.

The essential elements of perjury are "1) a false statement under oath, 2) made knowingly, wilfully and designedly, 3) made in a proceeding in a court of competent jurisdiction, or concerning a matter wherein the affiant is required by law to be sworn, and 4) made as to some matter material to the issue or point in question." *State v. Basden*, 110 N.C. App. 449, 453, 429 S.E.2d 740, 742 (1993). Here, the defendant contends that the statement he made in the 90-day inventory was (1) not a "false statement" within the definition of perjury; and (2) not material to the issue in question. We disagree.

Defendant asserts that the purpose of the 90-day inventory is to declare the fair market value of the assets of the estate at the time of the decedent's death in order to identify property for heirs and creditors to claim later. Defendant argues that the inventory itself does not include an assertion that the Wachovia checking account contained $27,885 on the date on which the document was signed and sworn. Rather, the defendant merely stated that the checking account was part of the inventory of the estate which had "come into his hands" as personal representative, and that the value of the account was $27,885. Additionally, defendant contends that even if the statement is construed as false, the statement was not material because the critical determination in an inventory is what is owned, not where it is kept.

Under North Carolina law, the executor or administrator of an estate is permitted to make honest errors in describing and noting the debts and the assets in a 90-day inventory. *See Grant v. Reese*, 94 N.C. 720 (1886) ("The executor or administrator may show . . . that he had made mistakes in noting the property properly, and its condition." *Id.* at 724.) However, an executor will not be permitted to misstate the value of an account to cover up the fact that he has misappropriated funds.

The law requires such inventory to be *made under oath*, and it is the duty of an executor or administrator, incident to his office as such, to make proper inquiry as to the property—its nature and condition—with which he ought to be charged, and *it is presumed when he notes it in the inventory, that he describes it correctly* . . . .

*Id.* (emphasis added). Here, the defendant reported that the "value" of the checking account was $27,885. In reality, the checking account contained $17,885 and the defendant had misappropriated $10,000. Defendant's misstatement was not a matter of making an incorrect estimate or an honest mistake. Rather, it was a material statement which was intentionally false, made under oath. Accordingly, we conclude that the trial court did not err in denying defendant's motion to dismiss the charge of perjury in the 90-day inventory of the estate.

[3] Next, we consider whether the trial court erred in its jury instructions on perjury. The trial court based these instructions on the pattern jury instructions for perjury. N.C.P.I., Crim. 228.10. The defendant argues that the instructions essentially mandated that the jury find defendant's false statements to be material. Defendant asserts that the instructions denied defendant his constitutional right to have the jury determine each element of the offense charged.

On the perjury count 96 CRS 8146, the trial court instructed:

For you to find [defendant] guilty of perjury . . . the State must prove five things beyond a reasonable doubt. First, . . . the Defendant made a statement in the 90-day inventory . . . . Second, . . . the Defendant was under oath. Third, . . . the statement was false. . . . Fourth, the State must prove that the statement made was material; that is, that it tended to mislead the probate court in regard to a significant issue of fact. The identification and value of assets were significant issues of fact in the 90-day inventory filed in the Estate of Georgiana Alexander. And fifth, . . . that the Defendant acted willfully and corruptly . . . .

In instructing on 96 CRS 8147, the trial court instructed the jury:

In order for you to find him guilty of perjury, the State must prove five things beyond a reasonable doubt . . . . First, that the Defendant made a statement in the annual accounting . . . Second, . . . the Defendant was under oath. Third, . . . the statement was false . . . . Fourth, the State must prove beyond a reasonable doubt that the statement was material; that is, that it tended to

mislead the probate court in regard to a significant issue of fact. Members of the Jury, the identification and value of assets and receipts are significant issues of fact in the annual accounting filed September 18, 1995 in the Estate of Georgiana Alexander. And fifth, . . . the Defendant acted willfully and corruptly . . . .

Defendant asserts that the trial judge, as part of his definition of materiality, told the jury that identification and value of assets were significant issues of fact, thereby resolving the question of materiality for the jury and removing the question from their consideration. We agree.

Under North Carolina law, the materiality of a false statement is an element of perjury. *See Basden*, 110 N.C. App. at 453, 429 S.E.2d at 742. In *State v. Wilson*, 30 N.C. App. 149, 226 S.E.2d 518 (1976), the trial court gave the jury similar perjury instructions to the ones given here. The trial court in *Wilson* gave these instructions:

> The State must prove that the testimony was material; that is, that it tended to mislead the jury in regard to a significant issue of fact. Whether Charles Austin Pearson on September 29, 1973, was attacked or assaulted by two men; that Charles Austin Pearson did not assault or attack anyone; and that Charles Austin Pearson did not go to the automobile of W. G. Morgan was (sic) significant issues of fact in the Charles Austin Pearson trial.

*Id.* at 154, 226 S.E.2d at 521. On appeal, Defendant Wilson made essentially the same argument that Defendant Linney makes here, contending that these instructions decided the issue of materiality for the jury. In *Wilson*, this Court rejected the defendant's argument, stating:

> The rule established in almost all jurisdictions in which the point has been in any way passed upon is that on a trial for perjury the question of the materiality of the alleged false testimony is in its nature a question of law for the court rather than of fact for the jury.

*Id.* at 154, 226 S.E.2d at 521 (citations omitted).

However, *Wilson* was decided well before *United States v. Gaudin*, 515 U.S. 506, 132 L. Ed. 2d 444 (1995). In *Gaudin*, the United States Supreme Court considered whether a defendant has a right to have the jury decide the materiality element of perjury. In *Gaudin*, the Supreme Court, relying on the Fifth and Sixth Amendments, said

that the Constitution "require[s] criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at 510, 132 L. Ed. 2d at 449. Accordingly, a unanimous Supreme Court held that Defendant Gaudin had the constitutional right to have the jury decide materiality in a prosecution for perjury. *See id.* at 523, 132 L. Ed. 2d at 458.

The *Wilson* Court, writing before *Gaudin*, held that the pattern jury instructions on perjury properly allowed the *judge* to decide the issue of materiality. To argue today that the same language in the pattern jury instructions allows the *jury* to decide the issue of materiality is untenable. The language of the pattern jury instructions must yield to the mandate of *Gaudin*. Accordingly, we conclude that the trial court erred in giving these instructions to the jury.

**[4]** Next, we consider whether the trial court erred in admitting evidence which the defendant had provided to the North Carolina State Bar as part of the Bar's investigation of defendant's fitness to practice law in North Carolina. Defendant provided numerous bank records to State Bar investigator Donald Jones. Mr. Jones in turn provided S.B.I. investigators with copies of these documents, along with his own analysis of defendant's bank accounts and information about his interviews with defendant. The defendant argues that he was forced to cooperate with the State Bar investigation or face disbarment. He asserts that the prosecutor's use of his statements to the Bar and the records he provided to the Bar violate his constitutional right to avoid self-incrimination under the Fifth Amendment. This is an issue of first impression before our Court.

First, we begin by analyzing whether the trial court improperly admitted evidence of defendant's statements to the State Bar. At trial, the presiding court ruled that statements made by the defendant to the Bar investigators were inadmissable. In so ruling, the trial court excluded "any revelations made by the defendant to this witness [Mr. Jones] or any other witness in furtherance of an investigation by the Bar Association for the alleged misconduct of the defendant as a lawyer." Later, however, the judge deviated from this ruling by allowing into evidence Mr. Jones' affidavit which contained statements made by defendant. Additionally, the trial court allowed Mr. Jones to testify on redirect examination about defendant's statements to him about the whereabouts of the proceeds of the $10,000 CD. This testimony was admitted in response to defendant's attempted impeachment of Mr. Jones on cross-examination. We con-

clude that the trial court did not err by allowing into evidence statements made by defendant to State Bar investigators as part of the Bar's investigation.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The Amendment protects an individual "against being involuntarily called as a witness against himself in a criminal prosecution . . . ." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 38 L. Ed. 2d 274, 281 (1973). Further, the Amendment also allows an individual "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Id.* The Fifth Amendment's privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761, 16 L. Ed. 2d 908, 914 (1966). The self-incrimination clause of the Fifth Amendment has been incorporated in the Fourteenth Amendment and applies to states. *See Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653 (1964).

The defendant relies on *Garrity v. New Jersey*, 385 U.S. 493, 17 L. Ed. 2d 562 (1967) to support his argument that his constitutional rights were violated. In *Garrity*, the United States Supreme Court evaluated a case in which police officers were investigated by the Attorney General of New Jersey regarding improper treatment of traffic cases in municipal court. Before being questioned, each officer was warned (1) that anything he said might be used against him in a criminal proceeding later; (2) that he had the right to refuse to answer if the disclosure would tend to incriminate him; (3) but, if he refused to answer, he would be subject to dismissal. The officers were forced to choose between losing their employment with the state, or incriminating themselves by answering the questions. The officers chose to answer the questions. Some of their answers were then used to convict them in subsequent prosecutions.

The United States Supreme Court held that these statements were involuntary, because the officers were forced to choose "between the rock and the whirlpool." *Id.* at 498, 17 L. Ed. 2d at 566. The Court stated, "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits [the] use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." *Id.* at 500, 17 L. Ed. 2d at 567.

The defendant further relies on *Debnam v. N.C. Dept. of Correction*, 334 N.C. 380, 432 S.E.2d 324 (1993) to support his argument. In *Debnam*, a Department of Corrections employee was threatened with dismissal for refusing to answer questions in an internal investigation. When the state employee asserted his privilege against self-incrimination, he was discharged. The Supreme Court of North Carolina evaluated the constitutionality of the discharge. The Court held that the discharge was constitutional, concluding that an individual's constitutional rights are endangered only by the combined risks of both compelling the individual to answer incriminating questions and compelling the individual to waive immunity from the use of those answers. *See id.* at 388, 432 S.E.2d at 330.

Here, the defendant asserts that both the *Garrity* case and the *Debnam* case are analogous to the case at bar. In particular, the defendant asserts that the statements he made to the State Bar investigators, like the statements in *Garrity* and *Debnam*, were compelled. We disagree. In *Garrity*, the police officers were specifically told that if they did not answer questions, they would be subject to dismissal. Similarly, in *Debnam*, the Department of Corrections employee was explicitly told that if he refused to answer questions in an investigation, he would be discharged. Here, Defendant Linney was never warned that he could be disbarred if he failed to cooperate with Mr. Jones.

Defendant attempts to rely on the North Carolina statutes which delineate the powers of the State Bar. Specifically, N.C.G.S. § 84-29 provides "the disciplinary hearing commission . . . shall have the power to subpoena and examine witnesses under oath, and to compel their attendance, and the production of books, papers and other documents or writings deemed by it necessary or material to the inquiry." In this case, defendant, acting of his own volition, made statements to Mr. Jones; the record does not indicate that these statements were extracted under the power of a subpoena. Defendant was not in custody at the time these statements were made. Additionally, defendant attempts to rely on N.C.G.S. § 84-28(b), which provides that:

The following acts or omissions by a member of the North Carolina State Bar . . . shall constitute misconduct and shall be grounds for discipline . . . (3) . . . failure to answer any formal inquiry or complaint issued by or in the name of the North Carolina State Bar in any disciplinary matter . . . .

Here, Defendant Linney's statements to Mr. Jones in investigation interviews were not part of an answer to a formal inquiry or complaint. Unlike the statements in the *Garrity* and *Debnam* cases, the defendant's statements here were not compelled. Additionally, we note that both the *Garrity* case and the *Debnam* case are distinguishable from the case at bar because both those cases involve investigations of state employees. The defendant here is not a state employee, but an attorney who has been given the *privilege* of practicing law in this state and serving in a profession imbued with the public trust.

> [A] lawyer is not an employee of the State. He does not have the responsibility of an employee to account to the State for his actions because he does not perform them as agent of the State. His responsibility to the State is to obey its laws and the rules of conduct that it has generally laid down as part of its licensing procedures.

*Spevack v. Klein,* 385 U.S. 511, 520, 17 L. Ed. 2d 574, 580 (1967) (Fortas J., concurring). As Judge Benjamin Cardozo wrote, "Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but is equally essential afterwards. Whenever the condition is broken the privilege is lost." *In re Rouss,* 221 N.Y. 81, 84, 116 N.E. 782, 783 (1917) (internal citations omitted), *cert. denied,* 246 U.S. 661, 62 L. Ed. 927 (1918).

As an officer of the court, a lawyer should indeed cooperate with state bar investigations. "The very accusation of [misconduct by lawyers] understandably concerns the public and justifies formal investigation of it. When the accusations are met with stony silence, or worse, affirmative obstruction of inquiry into them, the result denigrates us all." *Contico International, Inc. v. Alvarez,* 910 S.W.2d 29, 44 (Tex. Ct. App. 1995), *overruled on other grounds,* 917 S.W.2d 787 (Tex. 1996). However, the choice of whether the defendant cooperates in the bar proceedings or invokes the Fifth Amendment privilege is still, of course, his to make. "The special responsibilities that [a lawyer] assumes as licensee of the State and officer of the court do not carry with them a diminution, however limited, of his Fifth Amendment rights." *Spevack,* 385 U.S. at 520, 17 L. Ed. 2d at 580 (Fortas J., concurring). The constitutional privilege against self-incrimination is the lawyer's, as it is any citizen's, and such privilege may be properly exercised. *See id.*

The United States Supreme Court has said that the privilege against self-incrimination is a personal one. To be available to a witness it must be claimed. *See Rogers v. United States*, 340 U.S. 367, 370-71, 95 L. Ed. 344, 348, *reh'g denied*, 341 U.S. 912, 95 L. Ed. 1348 (1951). *See also Board of Overseers of the Bar v. Dineen*, 481 A.2d 499, 503 (Me. 1984); *State v. Merski*, 437 A.2d 710, 716 (N.H. 1981), *cert. denied*, 455 U.S. 943, 71 L. Ed. 2d 655 (1982). Here, Defendant Linney was within his rights to assert his Fifth Amendment privilege against self-incrimination during the Bar's disciplinary proceedings. Instead, Defendant Linney made voluntary statements to a bar investigator and never invoked his Fifth Amendment rights until he reached the criminal proceedings. Accordingly, we conclude that the trial court did not err in admitting into evidence statements made by defendant to State Bar investigators as part of the Bar's investigation.

Further, we note that even if Defendant Linney had asserted his Fifth Amendment privilege during the bar proceedings, the protection would not extend to Defendant Linney's records. The Fifth Amendment privilege does not apply to production of records that an attorney is required by law to maintain. *See Shapiro v. United States*, 335 U.S. 1, 92 L. Ed. 1787, *reh'g denied*, 335 U.S. 836, 93 L. Ed. 388 (1948)). In *Shapiro v. United States*, the Supreme Court of the United States held that the compelled production of sales records by merchants did not violate the Fifth Amendment. Under the Emergency Price Control Act of 1942, licensed businesses were required to maintain records and make them available for inspection by administrators. The Court stated no Fifth Amendment protection attached to production of the "required records" which the "defendant was required to keep, not for his private uses, but for the benefit of the public, and for public inspection." *Id.* at 17-18, 92 L. Ed. at 1799 (quoting *Wilson v. United States*, 221 U.S. 361, 381, 55 L. Ed. 771, 779 (1911)). In *Baltimore Dept. of Social Servs. v. Bouknight*, 493 U.S. 549, 107 L. Ed. 2d 992 (1990), the United States Supreme Court stated "where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him." *Id.* at 558, 107 L. Ed. 2d at 1002 (quoting *Wilson*, 221 U.S. at 382, 55 L. Ed. at 780).

Here, the defendant was required to keep records of his trust account and other accounts available for inspection by the State Bar. Under the Rules and Regulations of the State Bar, Rule B.0128 states:

"the Chairperson of the Grievance Committee is empowered to issue an investigative subpoena to a member compelling the production of any records *required to be kept* relative to the handling of client funds and property by the Rules of Professional Conduct . . ." (emphasis added). Accordingly, we conclude that the trial court properly overruled defendant's objection to the admission of these records and the analysis based on them.

**[5]** Next, we consider whether the trial court erred in allowing the State's motion to join the offenses for trial. The State charged the defendant in separate bills of indictment with 3 counts of embezzling, and 3 counts of perjury. These counts included: (1) 21 July 1993—embezzling from Mrs. Alexander; (2) 15 July 1994 to 28 March 1995—embezzling from Mrs. Alexander's estate; (3) 22 July 1994 to 2 September 1994—embezzling from Mrs. Alexander's estate; (4) 27 March 1995—committing perjury by falsely reporting the property in the 90-day inventory; (5) 18 September 1995—committing perjury by falsely reporting the amount of property in the estate; (6) 10 May 1996—committing perjury by falsely reporting the amount of property in the estate. The trial court allowed the State's motion to join all the offenses for trial. The defendant argues that this was improper because there is no transactional connection between the offenses. The defendant asserts that the time interval between the offenses is too great, and that the offenses are factually distinct, involving different pieces of property, and different entities to whom defendant owed a fiduciary duty. We are not persuaded.

Under N.C.G.S. § 15A-926(a), "[t]wo or more offenses may be joined . . . for trial when the offenses . . . are based on the same act or transaction or series of acts or transactions connected together or constituting parts of a single scheme or plan." In evaluating issues of joinder, "the court should consider the nature of the offenses to be joined and the commonality of facts." *State v. Breeze*, 130 N.C. App. 344, 354, 503 S.E.2d 141, 148, *disc. review denied*, 349 N.C. 532, 526 S.E.2d 471 (1998). The court must find that the consolidation does not prejudice the defendant by hindering his ability to present a defense and receive a fair trial. *See id.* The trial court's ruling on the joinder issue will not be disturbed on appeal absent an abuse of discretion. *See id.*

Here, the trial court concluded:

[T]hat all of these allegations or charges could be considered a part of a common scheme or plan, albeit occurring on different

dates ranging allegedly between July of '93 up through some time in 1996. They all involved alleged misappropriation, mishandling or misaccounting with regard to the estate of Mrs. Georgiana Alexander, with the exception of 8150, which has to do with embezzlement of money from her person; she then—at that time she was then living.

We conclude that the trial court did not abuse its discretion. In analyzing joinder questions, this Court considers whether, if the motion to sever had been allowed, evidence of the other offenses would have been admissible at each trial to show a common scheme or plan. *See State v. Cummings*, 103 N.C. App. 138, 141, 404 S.E.2d 496, 498 (1991). This Court has stated "prior cases have held that intervals of seven and ten years are not necessarily too remote to preclude the admission of prior bad acts." *State v. Blackwell*, 133 N.C. App. 31, 36, 514 S.E.2d 116, 120, *cert. denied*, —— N.C. ——, —— S.E.2d —— (1999). Further, the defendant has not shown that the offenses are so separate in time and place, or so distinct in circumstances as to render a consolidation unjust. Nor has the defendant shown how the consolidation has prejudiced his ability to present a defense and receive a fair trial. Accordingly, this assignment of error is overruled.

[6] Next, we consider whether the trial court erred in admitting opinion testimony. The defendant argues that the trial court improperly permitted non-expert witnesses to give legal opinions regarding defendant's actions. Over objection, Buncombe County Clerk of Superior Court Robert Christy was allowed to give his opinion regarding whether an undocumented loan out of a ward's estate met the "reasonable and prudent" standard under N.C.G.S. § 35A-1251. Mr. Christy further testified over objection that the failure to list such a loan as an asset on the guardian's report would constitute a breach of fiduciary duty.

Mr. Christy was not formally tendered as an expert witness. In North Carolina, "a nonexpert may not testify to the legal effect of a transaction or other fact." 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 182, at 611 (5th ed. 1998). However, whether or not a witness has been formally tendered as an expert is not controlling. In *Guyther v. Nationwide Mut. Fire Ins. Co.*, 109 N.C. App. 506, 515, 428 S.E.2d 238, 243 (1993), this Court stated, "[a]lthough these witnesses were not formally tendered nor recognized by the court as experts, the trial court by implication ruled that they were experts when, upon hearing their qualifications, the trial court permitted them to give expert testimony." Here, the evidence

indicated that Mr. Christy was a licensed attorney, and had served seven years as Assistant Clerk and seven years as Clerk of Superior Court. Mr. Christy had been involved in over three hundred prior incompetency guardianships.

> A witness is qualified to offer expert opinion testimony if it is shown that the witness is trained, skilled or experienced in the subject area in question. The decision to qualify a witness as an expert is within the discretion of the trial court, and will be reversed only if there is no evidence to support it.

*Id.* (internal citations omitted). Accordingly, we conclude that Mr. Christy may appropriately be considered an expert. However, under North Carolina law, even experts may not give testimony which purports to state whether a legal standard has been met. *See State v. Ledford,* 315 N.C. 599, 340 S.E.2d 309 (1986).

Here, the question to which defendant objected was: "[I]f a prudent person were to invest or loan ten thousand dollars to the law practice of someone such as [defendant], would you expect that there would be some documents that would reflect that loan? . . . Under the reasonable and prudent manner requirement set out in the statute?" Additionally, the district attorney was permitted to ask Mr. Christy, "would it be a breach of fiduciary duty not to accurately reflect where her money is? . . . [in] [y]our opinion as clerk, judge of probate and someone who has handled many estates."

We conclude that the trial court erred in admitting Mr. Christy's testimony in response to these questions. "[U]nder the . . . rules of evidence, an expert may not testify that a particular legal conclusion or standard has or has not been met, at least where the standard is a legal term of art which carries a specific meaning not readily apparent to the witness." *HAJMM Co. v. House of Raeford Farms,* 328 N.C. 578, 586, 403 S.E.2d 483, 488 (1991) (quoting *Ledford,* 315 N.C. at 617, 340 S.E.2d at 321). According to the *HAJMM* Court, the admission of this testimony invades that province of the court to determine the applicable law and to instruct the jury as to that law. Further, "an expert is in no better position to conclude whether a legal standard has been satisfied or a legal conclusion should be drawn than is a jury which has been properly instructed on the standard or conclusion." *Id.* at 587, 403 S.E.2d at 489. Additionally, the *HAJMM* Court specifically stated "the witness may not opine that a fiduciary relationship exists or has been breached. The trial judge should instruct the jury with regard to factors which give rise to the relationship." *Id.* at 588,

403 S.E.2d at 490. We conclude that the admission of this testimony was prejudicial error.

Next, we turn to the testimony of Assistant Clerk of Superior Court Elaine Hunter. Ms. Hunter had been in charge of the estates section of the Buncombe County clerk's office for nineteen years. Even though Assistant Clerk Hunter was not formally tendered as an expert, Ms. Hunter is, by virtue of her vast experience, an expert in the handling of decedents' estates. Ms. Hunter testified that it would violate the law for an administrator of an estate to rent property belonging to the estate without first obtaining permission from the clerk of court. She testified further that it would be illegal for an administrator to deposit the proceeds from such rentals into the administrator's personal account. Ms. Hunter's testimony addressed the legality of defendant's conduct. Whether defendant's actions were legal or not was the fundamental question the jury had to answer. *See, e.g., State v. Carr*, 196 N.C. 129, 132, 144 S.E. 698, 700 (1928). Although her testimony was admitted without objection, it was clearly prejudicial. We conclude that the trial court committed plain error in the admission of Ms. Hunter's testimony.

Because of our disposition of this issue, we need not address whether the trial court improperly admitted the opinion evidence of State Bar investigator Donald Jones.

Vacated in part, remanded in part.

Judges McGEE and HORTON concur.