ASSOCIATED INDUSTRIAL CONTRACTORS, INC., PLAINTIFF v.
FLEMING ENGINEERING, INC., DEFENDANT

No. COA02-1720

(Filed 3 February 2004)

**1. Negligence— surveying—standard of care**

Plaintiff's offer of testimony of a surveyor with ten years experience who was employed by defendant was sufficient to

establish the standard of care in a claim for negligent surveying. Moreover, expert testimony is not required where the trier of fact is able to decide the issues based on common knowledge and experience.

**2. Negligence— surveying—judicial notice of statutes**

Judicial notice of statutes was not error in a bench trial on a negligent surveying claim where the findings indicate that the court viewed the statutes as setting forth the nature of defendant's profession. Any error in regarding certain statutes as setting a specific standard of care was harmless because plaintiff presented sufficient evidence of the standard of care and because the standard of care was within the common knowledge and experience of the trial court.

**3. Negligence— surveyors—evidence sufficient**

There was sufficient evidence to find a surveyor negligent in a bench trial, despite evidence to the contrary.

Judge EAGLES dissenting.

Appeal by defendant from judgment entered 31 May 2002 and order entered 17 June 2002 by Judge John O. Craig, III, in Rockingham County Superior Court. Heard in the Court of Appeals 13 October 2003.

*Parker, Poe, Adams & Bernstein, L.L.P., by R. Bruce Thompson, II, and Heather N. Oakley, for plaintiff-appellee.*

*Hedrick, Eatman, Gardner & Kincheloe, L.L.P., by Allen C. Smith and C.J. Childers, for defendant-appellant.*

GEER, Judge.

Defendant Fleming Engineering, Inc. ("Fleming"), a surveying company, appeals from the trial court's judgment following a bench trial in favor of plaintiff Associated Industrial Contractors, Inc. ("AIC"), a general contractor that hired defendant in connection with the construction of a building addition. It was Fleming's responsibility to perform a survey that would pinpoint the location for columns forming the framework of the addition in order to ensure that the addition's walls would be completely square. After Fleming completed the survey and AIC began construction, AIC discovered that the line of columns forming the south wall of the structure was not

parallel to the north wall, but rather was skewed. The central issue at trial was whether Fleming negligently misidentified the location for the columns or whether AIC improperly placed the columns after the center points for the columns had been correctly set by Fleming. We hold that the record contains sufficient evidence to support the trial court's determination that Fleming was the negligent party.

Honda hired AIC to build an addition to the west of an existing building at its facility in Swepsonville, North Carolina. Because an overhead crane needed to travel on rails from the existing building through the addition, the new structure (approximately 80 feet wide by 120 feet long) had to be perfectly square with the main building. The plans for the addition called for ten columns, five on the north side of the addition and five on the south side. Each column was to be held in place by a base plate with anchor bolts that had been lowered into a footing. Footings already existed for the two columns closest to the main building, but the location of each of the remaining eight columns needed to be determined by surveying.

AIC decided that it needed to hire a professional surveying firm to locate the columns because the acceptable tolerances for the columns were so tight as a result of the column's base plate design and the crane running from the main building into the addition. AIC supervisors had determined that each column could be no more than one-eighth of an inch out of alignment. AIC employees did not believe that they could use conventional methods to survey the location of the columns with the necessary accuracy because there were several existing buildings closely surrounding the construction site and because constant wind interfered with their attempts to identify the column center points with a plumb bob, one of the traditional techniques. AIC concluded that a professional surveyor, using electronic devices, was needed to ensure accurate placement of the columns.

In late December 2000, AIC hired Fleming to perform the survey. Fleming surveyor Johnny Register, Jr. met with AIC construction superintendent Lanny Joyce to review the architectural plans and AIC's requirements, including the location and distance between the columns and the need to have the building precisely square.

AIC called Mr. Register as a witness and he described in detail how he performed the survey. He did not work alone, but rather brought another Fleming employee, John Davis, with him to act as his "instrument man." They worked with an electronic transit, a device equipped with a scope that has a zoom focus allowing the person

operating it to see string lines on a plumb bob a "couple of hundred feet away[.]" In addition, it has an LCD screen that reports the angle that the person has rotated and distances that are being measured. Mr. Davis operated the electronic transit while Mr. Register marked with nails both the center points for the columns and offset points. According to Mr. Register, they were supposed to ensure that each of the column center points was on a straight 180° angle line extending out from established points on the existing building. The north and south lines of column center points were supposed to be parallel and the corners of the addition were required to be 90° angles.

Mr. Davis operated the electronic transit to check the distances for the placement of each nail at a center point and to check the necessary angles. Mr. Register then placed the nails; in the process, he used a plumb bob with his body blocking the wind. Although Mr. Register testified that Mr. Davis was the "instrument man," Mr. Register reported that he "did look back through the instrument to confirm straight lines through most of these points."

With respect to the offset points, Mr. Register knew that AIC would be required to excavate the footers for the columns and, as a result, remove the nails at the center points. The purpose of the offset points was to enable AIC to accurately recreate the center points originally set by the Fleming survey. The parties do not dispute that this is a conventional approach. They do dispute, however, whether Mr. Register, after completing the survey, recommended to AIC that it have a second survey performed to ensure that the center points were properly restored.

Mr. Register finished surveying the project on 22 December 2000. When AIC construction superintendent Joyce attempted to check Mr. Register's work by using a tape measure, it appeared to be accurate although he was unable to complete his check because excavation equipment had been parked along one of the lines.

In order to relocate the center points after the footers had been dug, AIC employees attached nylon strings to the offset point nails and pulled them taut. The point where the strings intersected indicated the center point for each column. On the south column line, AIC employees successfully completed the footers for three columns and recreated the center points using the offset points that Mr. Register had specified. When they started work on the fourth column, however, they realized that part of a concrete slab was extending into the area for the footer and would have to be removed. The "batter

board" containing the offset nail set by Mr. Register was attached to the concrete slab and had to be moved. The "batter board" was moved back and a string attached to the original offset nail was extended back to the new "batter board" using a technique, according to AIC employees, designed to maintain the proper alignment so that AIC would be able to recreate the center point for the final column accurately. The AIC employee who performed the work described the technique as "the old way of doing it, but it's still the best way." AIC's manager for the Honda project, Scott Flanigan, claimed, "We move [batter boards] all the time. . . . It is not [a] significant . . . event for them to call and say, Scott, we're moving a batter board."

After AIC had installed the columns and crossbeams, AIC began erecting joists on top of the columns. While setting the first joist, AIC discovered that the column at the southwest corner of the addition was 5¾ inches out of line so that the joist extended beyond the column. AIC then checked each of the remaining columns. They found that the columns along the north side of the addition were all set correctly, but that four columns on the south line were off: one column by 5¾ inches, one by 4⅜ inches, one by 2¾ inches, and one by 1¾ inches. As a result, as Mr. Register admitted, the south line of columns "was in a straight line at a skew . . . ." The building was not square. Plaintiff had to reposition the columns at a cost of $23,000.00.

AIC sued Fleming alleging that Fleming negligently performed its survey and that, as a proximate result of Fleming's negligence, AIC had to incur the cost of replacing the columns in the proper position. Defendant counterclaimed for the amount of $436.25 that it alleged AIC owed for completion of the survey.

Following a bench trial, the trial court found "by the greater weight of the evidence, that the Defendant miscalculated the location of the columns along the south wall" and that this failure proximately caused damages to plaintiff AIC in the amount of $23,000.00. The court deducted the amount of $436.00 owed by AIC to Fleming from the award and entered judgment in the amount of $22,564.00. Fleming has appealed from that judgment.

I

[1] We first address whether the trial court should have granted defendant's Rule 41(b) motion to dismiss based on AIC's failure to present expert testimony as to the standard of care applicable to

Fleming. Generally, a surveyor or civil engineer is required to exercise "that degree of care which a surveyor or civil engineer of ordinary skill and prudence would exercise under similar circumstances, and if he fails in this respect and his negligence causes injury, he will be liable for that injury." *Davidson & Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 668, 255 S.E.2d 580, 585, *disc. review denied*, 298 N.C. 295, 259 S.E.2d 911 (1979). AIC was thus required to prove that Fleming failed to exercise that degree of care which a surveyor of ordinary skill and prudence would exercise under similar circumstances.

The standard of care provides a template against which the finder of fact may measure the actual conduct of the professional. The purpose of introducing evidence as to the standard of care in a professional negligence lawsuit "is to see if this defendant's actions 'lived up' to that standard . . . ." *Little v. Matthewson*, 114 N.C. App. 562, 567, 442 S.E.2d 567, 570 (1994), *aff'd per curiam*, 340 N.C. 102, 455 S.E.2d 160 (1995). Ordinarily, expert testimony is required to establish the standard of care. *Bailey v. Jones*, 112 N.C. App. 380, 387, 435 S.E.2d 787, 792 (1993).

Here, plaintiff did not tender any witnesses as experts. Plaintiff did, however, offer the testimony of Mr. Register, Fleming's surveyor with ten years of surveying experience. Mr. Register described in great detail what Fleming was hired to do and how he and his assistant were supposed to accomplish their responsibilities. He explained how they were supposed to use the electronic transit device; each step that the operator of the device, Mr. Davis, was required to take; what each step was expected to achieve; what they could do to double-check their results; and what the result should have been if they performed as anticipated. This testimony was sufficient to establish the standard of care. *State v. Linney*, 138 N.C. App. 169, 183, 531 S.E.2d 245, 256 ("whether or not a witness has been formally tendered as an expert is not controlling" if the witness may appropriately be considered an expert based on qualifications), *disc. review dismissed and appeal dismissed*, 352 N.C. 595, 545 S.E.2d 214 (2000). *See also Noell v. Kosanin*, 119 N.C. App. 191, 196, 457 S.E.2d 742, 745 (1995) (holding expert testimony not required to defeat summary judgment in medical malpractice suit because defendant doctor's admissions were sufficient to establish the standard of care).

Moreover, expert testimony " 'is not required . . . to establish the standard of care, failure to comply with the standard of care, or prox-

imate cause, in situations where [the trier of fact], based on its common knowledge and experience, is able to decide those issues.' " *Erler v. AON Risks Servs., Inc.*, 141 N.C. App. 312, 318, 540 S.E.2d 65, 69 (2000) (quoting *Little*, 114 N.C. App. at 567, 442 S.E.2d at 570-71), *disc. review denied*, 548 S.E.2d 738 (2001). Defendant does not argue that complexity precludes application of the common knowledge exception. Instead, defendant urges that the exception should only apply when professional conduct is "grossly negligent." This Court has previously held, however, that the "common knowledge" exception applies either when (1) the professional's conduct is grossly negligent; or (2) the actions are " 'of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, a departure therefrom, or proximate causation.' " *Little*, 114 N.C. App. at 567-68, 442 S.E.2d at 571 (quoting *Bailey*, 112 N.C. App. at 387, 435 S.E.2d at 792).

While we have not located any North Carolina decisions that present circumstances similar to this case, other jurisdictions confronted with analogous facts have applied the "common knowledge" exception. In a case that mirrors this one, the Supreme Court of Nevada held that expert testimony was not necessary to establish the standard of care required of a surveyor hired to pinpoint the location of caissons that were to form the foundational support for an addition to a hotel. *Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 98 Nev. 113, 115, 642 P.2d 1086, 1087 (1982) (per curiam). After the caissons were drilled, it was discovered that several had been incorrectly placed and the plaintiff had to reposition them. The Nevada Supreme Court noted that the surveyor was "provided plans and specifications that reflected the location and dimensions of the caissons" and that the survey "emanated from existing, fixed monuments, the accuracy of which is not in doubt." Location of the caissons did not require "complex calculations or necessitate[] the reliance upon untrustworthy data such that accuracy could not be expected from performance done in a workmanlike manner." *Id.* at 115, 642 P.2d at 1087. In affirming the trial court's refusal to instruct the jury on expert testimony regarding the standard of care, the appellate court held:

> It is well settled that the standard of care must be determined by expert testimony unless the conduct involved is within the common knowledge of laypersons. Where, as in the instant case, the service rendered does not involve esoteric knowledge or uncertainty that calls for the professional's judgment, it is not

beyond the knowledge of the jury to determine the adequacy of the performance.

*Id.* (citation omitted). *See also Paragon Engineering, Inc. v. Rhodes,* 451 So.2d 274 (Ala. 1984) (expert testimony not required to establish the standard of care for a surveyor where non-expert testimony at trial was sufficient to assist the jury in deciding whether the site of a retention basin was accurately laid out with stakes by the defendant surveyor).

In this case, we hold that the nature of Fleming's actions fell within the "common knowledge" exception to the requirement that experts testify as to the requisite standard of care. It is within the common knowledge of a trier of fact that a surveyor hired to pinpoint columns for a rectangular building site that must be precisely square must accurately mark column locations so as to result in two sets of parallel lines connected by four 90° angles. As in *Daniel,* understanding this task "does not involve esoteric knowledge or uncertainty that calls for the professional's judgment" nor is it "beyond the knowledge" of the trier of fact as to whether lines and angles staked by a surveyor were straight and square. 98 Nev. at 115, 642 P.2d at 1087. Given that the survey at the Honda facility started from predetermined, fixed points and the sole task was to define straight lines and 90° angles, this is a case in which "accuracy could . . . be expected from performance done in a workmanlike manner." *Id.*

Defendant points to *Delta Envtl. Consultants of North Carolina, Inc. v. Wysong & Miles Co.,* 132 N.C. App. 160, 510 S.E.2d 690, *disc. review denied,* 350 N.C. 379, 536 S.E.2d 70 (1999), in which a company with contaminated soil and groundwater alleged that an environmental consulting firm negligently performed remedial work. After reviewing the transcripts and exhibits, this Court concluded that the consulting firm's work in delineating the scope of contamination was beyond the common knowledge of the jury and required expert testimony. *Id.* at 168, 510 S.E.2d at 696. Understanding the complex area of environmental consulting and pollution remediation is not analogous to understanding whether a surveyor hired to ensure that a building was square is required to plot out straight lines and 90° angles. We hold that the question whether defendant Fleming breached its standard of care was within the common knowledge and experience of the trial judge in this case.

ASSOCIATED INDUS. CONTR'RS, INC. v. FLEMING ENG'G, INC.

[162 N.C. App. 405 (2004)]

II

**[2]** Defendant next challenges the trial court's findings of fact taking judicial notice of various statutes relating to the practice of engineering and land surveying. The trial court found:

3. Under Rule 201(b) and (c) of the North Carolina Rules of Evidence, this Court takes judicial notice of N.C.G.S. § 89C-3(6)(a) and N.C.G.S. § 89C-3(7)(a)(4), relating to the practice of engineering and land surveying such that the Defendant was engaged in providing professional services which require special knowledge of mathematical, physical and engineering sciences and the observation of construction for the purposes of assuring compliance with the drawings and specifications together with setting [or] resetting survey reference points.

4. Under N.C.G.S. §89C-3 and 89C-2, the Defendant, as a regulated professional engineer and surveyor, had a legal duty to safeguard the property of the public. In this case, the Defendant was to render its services in a professional adequate and workmanlike manner, in light of Plaintiff's evidence that its employees did not feel competent in performing the work themselves. The Court finds that the Defendant failed to meet its legal duty and failed to meet the standard of care created by N.C.G.S. § 89C-2 and N.C.G.S. § 89C-3.

We believe that these findings indicate that the trial court viewed the statutes as setting forth the nature of defendant's profession. *See Greene v. Pell & Pell, L.L.P.*, 144 N.C. App. 602, 604, 550 S.E.2d 522, 523 (2001) (in a professional negligence case, plaintiff must show "(1) the nature of the defendant's profession; (2) the defendant's duty to conform to a certain standard of conduct; and (3) a breach of the duty proximately caused injury to the plaintiffs"). For example, the trial court cited N.C. Gen. Stat. § 89C-3(7)(a)(4), which includes in its definition of a land surveyor's occupation the act of "[d]etermining, by the use of the principles of land surveying, the position for any . . . reference point[.]" N.C. Gen. Stat. § 89C-3(7)(a)(4) (2003).

To the extent that Finding of Fact 4 suggests that N.C. Gen. Stat. §§ 89C-2, -3 (2003) create a specific standard of care, we agree with Fleming that the trial court erred in relying on those statutes. Any error was, however, harmless since AIC presented sufficient evidence of defendant's standard of care by offering the testimony of Mr.

Register and because the pertinent standard of care was within the common knowledge and experience of the trial judge.

### III

**[3]** Defendant argues that, even apart from the absence of expert testimony, the evidence is insufficient to support the trial court's finding that it was negligent. The trial judge's findings of fact are conclusive on appeal if supported by competent evidence, even if the record contains evidence to the contrary. *Huff v. Autos Unlimited, Inc.*, 124 N.C. App. 410, 413, 477 S.E.2d 86, 89 (1996), *cert. denied*, 346 N.C. 279, 487 S.E.2d 546 (1997). Our examination of the record reveals that competent evidence supported the trial court's finding that Fleming was negligent.

It is undisputed that the south line of columns, although virtually straight, was skewed, *i.e.*, not parallel to the north line, which was a precise 180° line extending from the main building. AIC argued that Fleming's employees had erred in making the calculations described by Mr. Register when it came to the south wall. Fleming contended to the contrary that the south columns were correctly placed when Mr. Register and his assistant completed the survey and became misaligned when AIC moved the batter board and recreated the center points. The parties agree that either AIC or Fleming was responsible for the error.

In support of its claim that the error was committed by Fleming, AIC offered the testimony of its project manager, Scott Flanigan. Mr. Flanigan is a structural engineer and has been licensed as a professional engineer. At the time of his testimony, he had overseen nearly 30 projects. Mr. Flanigan testified that the south columns were "in a straight line. Again, if it was an error that we made—if we just placed the columns willy-nilly, I'd expect one column to be up, one to be down, another one to be down, another one to be back up." Mr. Register confirmed that "they was [sic] in a straight line at a skew" extending out from the established point on the main building.

In response to Fleming's suggestion that the error occurred when AIC moved one of the batter boards, Mr. Flanigan and other witnesses testified that three of the south columns were already placed based on the Fleming offset points when the board was moved and that only the fourth column could have been affected by the moving of the batter board. Yet, the evidence established that all four columns were misaligned.

Fleming points to two pieces of evidence that it contends conclusively establish that it was not negligent. First, it claims that "Mr. Register was able to confirm that the lines were straight by flopping the transit without moving the base. This allowed him to confirm the one-hundred eighty (180) degree angles between the points on either side of his equipment." The evidence does not, however, establish conclusively that Mr. Register did confirm the accuracy of the work. Mr. Register testified that his assistant was operating the transit device (also called "the instrument") while Mr. Register was putting the nails into the ground:

> Q  Would you set the points in the ground, or would Mr. Davis set the points in the ground?
>
> A  He ran the instrument. I set the points, but also I did look back through the instrument to confirm straight lines *through most of these points.*

(Emphasis added) Although Mr. Davis was thus the person responsible for establishing the lines and angles, he did not testify. While Mr. Register's testimony indicates that he checked Mr. Davis' work for "most of these points," that testimony would permit a finding that he did not check all points. Since Mr. Register never testified that he confirmed that the south line of columns was a 180° straight line, his testimony cannot establish that the figures were accurate on the south line. Although Mr. Register did testify, as defendant states, about the technique for double-checking 180° angles, he never testified that he, as opposed to Mr. Davis, performed that check or that he had personal knowledge of the result.

Second, Fleming argues that AIC's construction superintendent Lanny Joyce checked Mr. Register's work after the survey was completed and Mr. Joyce's measurements indicated that the center points were within the permitted 1/8 of an inch tolerance. AIC, however, offered evidence that Mr. Joyce was using a tape measure, which could not provide precise measurement because "[w]ith a tape measure, . . . in temperature you've got all kinds of different things, how much the tape shrinks because of the weather, moisture, temperature. It's only as accurate as you can get it." Mr. Register confirmed that he did not use a tape when he did the survey because the electronic transit is "a whole lot more precise." AIC has argued that the whole point of having Fleming perform the survey was because AIC could not achieve measurements within the necessary tolerance using conventional means. The parties' competing argu-

ments on the weight to be given Mr. Joyce's measurements were for the trier of fact to resolve.

The trial judge was entitled to draw the inference that since the line was straight but not at the correct angle and since all four columns on the-south line were misaligned rather than just the one affected by the moved batter board, Fleming was more likely than not the source of the error. The standard of review is dispositive. Even though Fleming presented evidence that AIC was responsible for misplacement of the columns, a determination of the weight and credibility of evidence was the responsibility of the trial court as the fact finder. *Cartin v. Harrison,* 151 N.C. App. 697, 703, 567 S.E.2d 174, 178, *disc. review denied,* 356 N.C. 434, 572 S.E.2d 428 (2002). Because the record contains competent evidence supporting a finding that Fleming was negligent, the trial court's findings are conclusive despite the existence of evidence to the contrary. *Huff,* 124 N.C. App. at 413, 477 S.E.2d at 89.

Affirmed.

Judge HUNTER concurs.

Chief Judge EAGLES dissents with separate opinion prior to 30 January 2004.

EAGLES, Chief Judge, dissenting.

Because the plaintiff failed to establish the standard of care required to be exercised by a land surveyor, I respectfully dissent.

A land surveyor "does not . . . undertake to insure the correctness of his findings," 11 Am. Jur. Proof of Facts 2d 405; rather, a surveyor is only "required to exercise that degree of care which a surveyor or civil engineer of ordinary skill and prudence would exercise under similar circumstances . . . ." *Davidson and Jones, Inc. v. County of New Hanover,* 41 N.C. App. 661, 668, 255 S.E.2d 580, 585, *disc. review denied,* 298 N.C. 295, 259 S.E.2d 911 (1979). It is the general rule that expert testimony is required to establish the requisite standard of care. *Bailey v. Jones,* 112 N.C. App. 380, 387, 435 S.E.2d 787, 792 (1993). Ordinarily, this requires the plaintiff's expert to "testify as to generally accepted surveying practices to prove that the defendant did not perform his survey . . . according to the standards followed by an ordinarily prudent surveyor in similar circumstances." 11 Am. Jur.

Proof of Facts 2d 407. The only exception to this rule is where the "common knowledge and experience of the [fact finder] is sufficient to evaluate compliance with a standard of care . . . ." *Delta Env. Consultants of N.C. v. Wysong & Miles Co.*, 132 N.C. App. 160, 168, 510 S.E.2d 690, 695-96, *disc. review denied*, 350 N.C. 379, 536 S.E.2d 71 (1999).

I am unpersuaded that Mr. Register's own testimony was sufficient to establish the requisite standard of care. Although Mr. Register was certainly qualified to testify as an expert in this area, *see State v. Linney*, 138 N.C. App. 169, 183, 531 S.E.2d 245, 256-57 (witness may testify as an expert if qualified even though not formally tendered as an expert witness), *appeal dismissed and disc. review denied*, 352 N.C. 595, 545 S.E.2d 214 (2000), his testimony failed to establish the applicable standard of care. I disagree with the majority's characterization of Mr. Register's testimony: While Mr. Register testified extensively as to the process *he* went through to establish and verify the locations of the support columns, his testimony was limited to the procedure that he *in fact* followed, not the procedure he was "supposed" to follow. My review of the record reveals no testimony on the part of Mr. Register as to (1) what would constitute generally accepted surveying practices under similar circumstances, or (2) that the procedure he followed failed to comport with those standards. Plaintiff's evidence also included the testimony of Scott Flanigan and Lanny Joyce. Although both of these witnesses arguably were qualified to testify as experts in this field, neither testified as to either generally accepted surveying practices or that Mr. Register failed to perform the survey according to those standards. Consequently, I would conclude that plaintiff's expert testimony failed to establish the requisite standard of care.

I am also unpersuaded that this case falls within the "common knowledge" exception to the general rule requiring expert testimony. "[T]he application of the 'common knowledge' exception has been reserved for those situations where professional conduct is so grossly negligent that a layperson's knowledge and experience make obvious the shortcomings of the professional." *Delta Env. Consultants*, 132 N.C. App. at 168, 510 S.E.2d at 696. The majority, relying on *Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 98 Nev. 113, 642 P.2d 1086 (1982) and *Paragon Engineering, Inc. v. Rhodes*, —— Ala. ——, 451 So.2d 274 (1984), concludes that the "common knowledge" exception is applicable under these circumstances. Notwithstanding the facial similarity between these cases

and the facts presented here, these cases are readily distinguishable and do not support the application of the "common knowledge" exception to this case.

First, a careful reading of *Paragon* reveals that the only issue before that court was whether the testimony of "several witnesses, who were not professional surveyors," was sufficient to support the conclusion that the defendant was negligent in staking a survey site. *Paragon*, —— Ala. at ——, 451 So.2d at 274. The Court found that although none of plaintiff's witnesses were "expert[s] in the technical sense," *i.e.* professional land surveyors, three of plaintiff's witnesses were competent to testify as experts by virtue of their knowledge and experience. *Id.* at ——, 451 So.2d at 276. The *Paragon* court ultimately concluded that the testimony of these witnesses was sufficient to support the jury's conclusion. *Id.* at ——, 451 So.2d at 277. Because *Paragon* was based on application of the general rule, rather than the "common knowledge" exception, it is of little instructional value here.

Moreover, *Daniel* involves an action for breach of contract filed against the defendant surveyor when defendant improperly pinpointed the location of caissons designed to support a structure. The issue before the court was whether "expert testimony [wa]s required to prove the breach of duty." *Daniel*, 98 Nev. at 115, 642 P.2d at 1087. The *Daniel* court, applying the "common knowledge" exception, answered in the negative. *Id.*

Daniel is distinguishable in two significant respects: First, the underlying action in *Daniel* was for breach of contract, not negligence. Insofar as the holding in *Daniel* is based on an "implied [contractual] duty to perform in a workmanlike manner," *id.*, rather than the duty to exercise reasonable care under the circumstances, the reasoning of *Daniel* is inapposite to this case. *See Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 255 S.E.2d 580 (1979) (distinguishing actions based on contract from those based on negligence and refusing to impose contractual duties not "expressly assumed" under the terms of the contract).

Second, it is undisputed that here the conditions and strict tolerances necessitated employing the knowledge, skill and judgment of a professional surveyor. That was not the case in *Daniel. See id.* (noting "[t]here [wa]s nothing in the record to indicate that the survey required complex calculations . . . ."). I would conclude that this factual discrepancy is sufficient alone to distinguish *Daniel* and make the "common knowledge" exception inapplicable.

Even strict adherence to accepted surveying principles will, in some cases, yield inaccurate measurements. *See e.g.* 11 Am. Jur. Proof of Facts 2d 403-05, §§ 2-3. Therefore, application of the "common knowledge" exception must turn on something more than the ultimate result. The better reasoned approach, which is more directly related to the negligence standard, is to apply the "common knowledge" exception only where the surveyor was so grossly negligent in the *manner* in which he performed his professional services that his shortcomings as a professional are readily apparent to a layperson. Examples would include misreading plans and specifications, the taking of faulty measurements, or errors in recording data that, if pointed out and corrected, would yield accurate results. These are the types of errors that would be readily apparent to a layperson, without the need for explanation of complex principles by an expert in that profession. Since there is no evidence in the record that implicates any of these kinds of errors, I would conclude that expert testimony was necessary to determine whether defendant exercised the degree of care that an ordinarily prudent surveyor would have exercised under similar circumstances.

Accordingly, I would hold that plaintiff failed to establish the applicable standard of care and the trial court improperly denied defendant's motion to dismiss.